Edward J. Greenfield, J.
This is the tale of the stud who was a dud. Or so plaintiff claims. While we may be admonished not to look a gift horse in the mouth, when a horse is being purchased it has to be examined closely there and in several other places to be deemed acceptable. The action, which is for rescission of the sale of a horse because of a claimed breach of warranty, and for the return of the $75,000 purchase price, was tried before me without a jury, partly on stipulated facts, and partly on the testimony of breeders and veterinarians. Basically, two issues are raised — the extent to which the horse did not conform to the warranties of sale, and *962 whether or not the inspection of the horse and its rejection for inadequacy was timely.
The facts are these: On December 23, 1969 Jack Stahl entered into a written agreement with Martin Tananbaum to sell a 75% interest in the stallion Meadow Paige for the sum of $75,000. Meadow Paige was a standardbred who had achieved some degree of success in trotting races. $50,000 of the price was to be paid to Stahl on January 5, 1971, and the remaining $25,000 one year later. Title to the 75% interest was to pass to Tananbaum on January 5, 1971. As part of the transaction Tananbaum agreed to cosign a promissory note of $50,000 with Stahl. It was agreed that if Stahl defaulted on the note, the $50,000 would be made good by Tananbaum, who could treat that as a payment of the first installment. Tananbaum had the option of then paying the additional $25,000 to Stahl, in which event title to the 75% interest would pass upon such payment. It was further agreed that the horse could be raced until November 1, 1970 with the purses to be shared between the parties. Thereafter, Meadow Paige was to be retired to stud. Stahl agreed that between November 1 and December 31, 1970 he would have the horse tested on two separate occasions by different veterinarians, and would obtain their certificate that: (a) the stallion was fit for stud purposes; (b) the stallion’s sperm was normal for stud purposes; (c) the reproductive tract was normal for stud purposes; (d) that semen samples from the stallion would show a concentration of sperm at normal acceptable levels, the percentage of abnormalities within acceptable minimal limits, with acceptable survival time and normal acceptable mobility.
The agreement provided that if the required written certifications by licensed veterinarians were not delivered by Stahl, Tananbaum could elect to rescind the purchase.
On March 24, 1970, Mr. Tananbaum died. Shortly thereafter Stahl defaulted on the note which Tananbaum had cosigned. Tananbaum’s estate then paid the amount of the note, $50,000, to the bank, and also, on June 23, 1970 paid $25,000 to Stahl, completing the payment of the purchase price. Thereafter, in due course, all rights of the estate with respect to Meadow Paige were assigned to plaintiff, White Devon Farm. Meadow Paige continued to race through the summer of 1970, and was kept at the Houghton Stable where he had been placed by Stahl. In September of 1970, he was shipped to *963 the Collins Stable in Geneseo, New York, and in November of 1970, he was retired to stud at White Devon Farm.
The first attempts at breeding Meadow Paige did not meet with success. Stahl was informed of this, and he asked plaintiff to arrange for the tests by two licensed veterinarians. Accordingly, Meadow Paige was tested by Dr. Robert H. Pierson, resident veterinarian at White Devon Farm, and by Dr. Robert M. Kenney of the University of Pennsylvania. They each reported that after physical examination and miscroscopic evaluation of the stallion’s sperm, the stallion was not acceptable as a breeder and that the sperm was below the standards of acceptability.
On December 21, 1970 and January 25, 1971, plaintiffs attorney advised Stahl of the unsatisfactory results of the tests and asked for a refund of the purchase price pending further testing, or for rescission of the December 23, 1969 agreement. A copy of the test results was forwarded to Stahl on February 2, 1971. On February 23, 1971 Stahl’s attorney wrote to plaintiff denying any liability. Pending resolution of the dispute, Meadow Paige was retained at White Devon Farm, and there were continued attempts to breed him to various mares. Stud fees of $750 to $1,000 were charged per live foal.
Interestingly enough, although the veterinarians testified that sperm motility was less than 5%, that abnormalities were high and longevity was below normal, during the 1971 breeding season Meadow Paige was bred to 38 mares and produced 27 live foals. Does this subsequent success at siring foals negate plaintiff’s claims that the warranties as to the stallion’s capacity as a breeder were breached? The court concludes that it does not. The parties were entitled to get what they bargained for at the time that they bargained for it. The right of the buyer to rescind must be determined as of the time the election to rescind was exercised. The parties’ rights are not to be determined by subsequent events. Further, the question as to compliance with the warranties is to be measured by the specifics the parties agreed upon, and not by a generalized conclusion as to whether there was an overall fitness for the purposes intended. Every sale comprehends within it the warranty of fitness for the purpose intended, unless all warranties have been expressly excluded. The parties may nevertheless supplement the warranty of fitness and call for detailed and objective standards of compliance. That is *964 what the parties did here. Not only was Meadow Paige warranted as being fit for stud purposes, but the parties agreed that the semen samples had to be within normal acceptable limits. It is clear from the testimony of the expert veterinarians in the case and from their written reports that the samples of semen taken from the stallion were not within normal acceptable standards. While it may be surprising given the reports on microscopic evaluation, that Meadow Paige could produce a substantial percentage of live foals, the test is one of meeting the called-for standards and not of ultimate results. The expert testimony demonstrated that Meadow Paige was not satisfactory as a breeding stallion. When retired from racing, he did not appear to be terribly interested in breeding. Even with good libido, he was difficult to handle. He was clumsy, temperamental and awkward. In fact, the manager of the breeding farm testified that he was the "most dangerous stud horse with a mare that I have ever had experience with.” In order to produce the number of foals that he did, it was required that Meadow Paige be bred at a ratio of five times for each live foal. Normal performance would have required half those attempts. Had he been satisfactory, the testimony indicated, he could have been bred to 60 mares in a season, and should have produced 40 to 45 foals. While Meadow Paige earned $10,422 in stud fees for the farm in 1971 and 1972, the undisputed testimony was that he should have been able to produce $30,000 to 35,000 a year for up to 10 years. In fact, the testimony revealed that one 16-year-old stallion was earning $100,000 a year for his demonstrated prowess with horses of the opposite sex. (How shattering a revelation, and how humbling to the inflated ego of the human male, to realize that no one would evaluate his efforts on so lofty a pecuniary scale!) In any event, it is clear that even though Meadow Paige in his six years of racing compiled an enviable record of success, he was not satisfactory as a breeder. The express warranties of the contract of sale clearly were not complied with.
It is the defendant’s contention however, that title to the stallion passed on June 23, 1970, when Tananbaum’s estate completed payments, and that the inspection and election to rescind had to take place at that time. Defendant argues that it could not be held accountable if there were any changes in the physical condition of the horse between June and December of 1970. Plaintiff contends that the inspection took place *965 at the time agreed upon, and that its election to rescind was timely. Subdivision (a) of section 2-601 of the Uniform Commercial Code provides that a buyer may reject goods that fail to conform to contract specifications. Even after acceptance of the goods, the sale may be revoked if it is subsequently discovered that there is no conformity with the contract terms. (Uniform Commercial Code, § 2-608 subds [1], [3].) Was inspection and rejection in December, 1970 timely if title had passed six months before?
The court concludes that the answer to that question is in the affirmative. Where, as here, the facts are not substantially in dispute, the question of what is a reasonable time must be resolved by the court as a matter of law. The reasonable time for taking any action is dependent upon the nature, purpose and circumstances of the action. (Uniform Commercial Code, § 1-204, subd [2].) Defendant contends that the obligation to inspect within a reasonable time had to mean at or about the time title passed in June, 1970. There is no inflexible rule that the time for inspection must coincide with the passage of title. For example, in Schnitzer v Lang (239 NY 1), the buyer of goods informed the seller that the goods were to be stored for use the following season. Thus, the goods were not inspected and defects discovered until 10 months later. The Court of Appeals held that the seller was on notice that the goods might not be inspected until the following season. Similarly, in this case the inspection of the horse for breeding purposes was to come at the end of the racing season. In the ordinary course of things, title to the horse was not to pass until January 5, 1971, at which time the inspections would have been completed. The court concludes that the obligation to inspect, and the decision to accept or reject the horse was not affected by the fact that defendant defaulted on his promissory note, and as a result the passage of title was accelerated. It may well be that upon that accelerated date, June 23, 1970, plaintiff would have been obligated to ascertain the physical soundness of the horse, to ascertain if he was sound or lame, healthy or halt. That is all that the case of Miron v Yonkers Raceway (400 F2d 112) stands for. In that case, a horse was purchased at auction, but only a subsequent inspection revealed to the owner that the horse had a fractured bone. Under the terms of the agreement, the warranty was that the horse would be sound at the time that the buyer took possession, and the existence of a fracture should have been readily apparent.
*966 That situation is to be distinguished however, from the factual situation with which we are here confronted. A horse has at least two separate and disparate values — his value for racing, and his value for breeding. It is clear that Tananbaum was purchasing the horse primarily in contemplation of his value for breeding. While Meadow Paige had compiled a good racing record, he was six years old, and going into his last season of competition. A price of $75,000 for a partial interest in the horse evidently contemplated his producing progeny, not purses. The possibility that he might not be able to beget foals was not, if one may say it, inconceivable. In determining the value of a horse for racing, most of the facts as to its soundness are patent and readily observable. The condition of limbs, bony structure, gait, sheen, breathing and appearance can be judged for the looking. The value of a horse as a breeder is quite another matter, especially if he is still racing. There is no way that one can tell beforehand about a stallion’s libido, his sperm count, and his future behavior with mares. Such characteristics are latent, and discoverable only upon subsequent testing and empirical observation. Thus, it is neither unusual nor unreasonable to find that the parties fixed a specific date for inspection as to the horse’s breeding potential. Although the passage of title was scheduled in the first instance for January 5, 1971, it was certainly within the contemplation of the parties that title could pass at any earlier time, should defendant default on his note. Despite that very obvious possibility, the parties did not provide that inspection was to take place upon passage of title, but rather fixed a specific time for testing — between November 1 and December 31, 1970, when the horse would have been retired to stud. Subdivision (1) of section 1-204 of the Uniform Commercial Code permits the parties to fix a reasonable time for an action to be taken by agreement. Since Meadow Paige was to continue racing during the 1970 season, no matter who had title, it certainly was not unreasonable to call for inspection only after his racing career had come to a close. Having agreed upon the last two months of 1970 as a time for inspection, defendant cannot now be heard to argue that that agreement was negated by his own earlier act of default. Defendant’s argument that risks would be raised while a horse was being raced, which might affect his breeding abilities, is not an unreasonable one. However, both parties to the transaction were experienced horsemen. It would have been perfectly easy, had the parties desired it, to specify that the *967 inspection would take place within a specified period after the passage of title whenever that might be, rather than fixing a specific date when it was clear the horse would have been retired to stud. Perhaps if the horse had died or sustained a severe bodily injury during his last months of racing, the risk of the horse_developing such unsoundness might well be on the buyer. Here, however, the parties were dealing with possible defects which would not be discoverable until later, and they clearly agreed to put the risk of nonconformance with acceptable standards upon the seller.
It is apparent that the present attempt to claim that the inspection and rejection of the horse by the buyer is untimely is rather belated, and is an afterthought. Defendant’s actions at the time indicated otherwise. When he was paid out on June 23, 1970, he did not as provided by the agreement, himself undertake to have the stallion tested. Since Meadow Paige was still racing, that clearly was not within the contemplation of the parties. Even after title passed, the horse was kept at the same stable where defendant placed him. He continued to receive regular phone reports about the condition of the horse.
Although it was defendant’s obligation to arrange for the tests, he called plaintiff and asked it to handle the tests. Defendant was informed of the results of the tests and asked that copies of the test results be forwarded to him. He asked whether another test could be arranged. Such actions were inconsistent with any expectation or understanding that all defendant’s obligations with respect to the condition of the horse vanished after June 23,1970.
When defendant defaulted, he took all the risks inherent in placing exclusive possession, care and handling of the horse in plaintiff. Nevertheless, the projected standards which the horse was required to meet were to be measured at a specified and agreed upon date. Nothing in the conduct of the parties violated that aspect of the agreement.
It is the conclusion of the court, the horse not having met the specified standards in December of 1970, that the plaintiff could properly elect to rescind the transaction and recover the purchase price. That price was $75,000. Plaintiff having elected to rescind the transaction on February 18, 1971, any actions by White Devon Farm in breeding the horse and collecting stud fees were, in effect, as trustee for the defendant. Because of this, they are clearly entitled to offset the *968 expenses of maintenance. Plaintiff’s statement of a net profit of $10,422 for the horse in 1971 and 1972 should therefore be deducted from the purchase price to be returned. If there were other and further profits beyond that, defendant likewise is entitled to credit.