OPINION OF THE COURT
David B. Saxe, J.
The novel issue that I am asked to resolve in the context of this small claims proceeding is as follows: Is a consumer who purchases a dog with one undescended testicle entitled to damages amounting to a refund of the amount paid on the ground that the dog is defective and therefore nonmerchantable?
The essential facts are these: While passing by the American Kennels pet stores on May 20, 1983, at 786 Lexington Avenue in Manhattan, Ms. Ruby Dempsey, a Huntington, Long Island, school teacher, decided to investigate the purchase of a poodle.
Apparently overcome by the beauty of a four- and one-half pound, nine-week-old puppy, a pedigreed white poodle, Ms. Dempsey paid over $541.25 to the store and became the proud owner of a new pet whom she named Mr. Dunphy.
Five days after purchase, Mr. Dunphy was examined at the Animal Clinic of New York by veterinarian Dr. Malcolm A. Kram. Dr. Kram’s findings were succinct: “While *613 the dog appears in good physical health, I have found him to be a unilateral cryptorchid. This is considered to be a congenital defect.”
A unilateral cryptorchid is a dog with one undescended testicle. Ms. Dempsey was outraged and demanded a full refund from American Kennels. “It’s defective”, she exclaimed in court, referring to the hapless Mr. Dunphy. “I assumed it would be suitable for breeding but it’s defective — it can’t breed” she continued.
On July 5,1983, Mr. Dunphy was again examined at the Animal Clinic — this time by veterinarian Dr. Marco Zancope. Dr. Zancope confirmed the diagnosis of his colleague, viz., that Mr. Dunphy had only one normally descended testicle. Over the defendant’s objection, Ms. Dempsey returned Mr. Dunphy to the store and demanded a refund. The store refused and suit was begun.
At trial, Ms. Dempsey relied on the testimony of her two expert witnesses, Drs. Kram and Zancope, who reiterated the contents of their reports — that Mr. Dunphy had only one descended testicle, and also upon her belief, that due to this condition, the dog could not be properly bred.
When called as a witness, Dr. Kram acknowledged that the dog was in good health. Additionally, he stated that the level of fertility was about the same for a dog with Mr. Dunphy’s condition as compared with one with two normally descended testicles. Indeed, he stated that the condition might be later reversible with the “dropping” of the other testicle. The condition was, he continued, a genetic defect and a future litter would likely carry this trait. Finally, he stated, a dog with this condition could not be a show dog. Mr. Dunphy was not offered in evidence.
American Kennels, in defense, relies on the wording of its contract of sale and upon the expert testimony of its veterinarian, Dr. Richard Holmes, who examined the dog (it was returned to the store by Ms. Dempsey and never picked up by her) on July 15, 1983. At the time of the examination, Dr. Holmes found both testicles in the scrotum. “The right testicle is higher than the left but is scrotal. Both normal size and shape,” he wrote.
*614 Ms. Dempsey, still concerned presumably about this condition arising in future litters, insisted that the dog was still objectionable and pressed for a refund.
The contract of sale provides the consumer with rights to a full refund upon return of the pet “if your veterinarian finds within two weeks of sale that your pet is sick as to be unfit for purchase.” But, that was not the case here. Neither of the veterinarians who testified for Ms. Dempsey found Mr. Dunphy to be “sick as to be unfit for purchase.”
The contract of sale also provides a 60-day health guarantee to the buyer with a right to exchange the pet within 60 days of purchase if the veterinarian finds anything wrong with the pet. The clause continues: “in such case it will be exchanged for another pet of equal value of the customer’s choice at once or when available provided a letter from the examining veterinarian is presented as evidence of the pet’s illness and the pet is returned within the guarantee period.” This provision does not aid the claimant here because it provides for an exchange of pets (not a refund) and more importantly, it appears to be triggered only upon the discovery of some illness by the veterinarian. The heading of the clause is “60 day Health Guarantee” and thus bears out this conclusion.
Thus, whatever rights may expressly exist under the contract of sale, they are not of a nature to mandate the return of her purchase price.
The inquiry turns next to the applicability of one or more of the implied warranties which arise in connection with modern sales transactions under article 2 of the Uniform Commercial Code. Mr. Dunphy, a pet dog, is considered a “good” as defined by section 2-105 of the Uniform Commercial Code. (See Key v Bagen, 136 Ga App 373.)
Section 2-314 of the Uniform Commercial Code provides that “(1) [u]nless excluded or modified * * * a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind.” Subdivision (1) of section 2-104 defines a merchant as “a person who deals in goods of the kind or otherwise by his occupation holds himself out as having knowledge or skill peculiar to the practices or goods involved in the transaction or to whom such knowledge or *615 skill may be attributed by his employment of an agent or broker or other intermediary who by his occupation holds himself out as having such knowledge or skill.” Here, it cannot be disputed that the vendor, American Kennels, is a merchant in the business of regularly selling dogs and other pets.
Subdivision (2) of section 2-314 of the Uniform Commercial Code sets forth a complex definition of merchantability with six standards. These standards are designed to be minimal requirements since goods are required to “at least” conform with all of the tests to be “merchantable” (see Uniform Commercial Code, § 2-314, Comment 6).
The first test of merchantable quality is whether the goods “pass without objection in the trade under the contract description” (Uniform Commercial Code, § 2-314, subd [2], par [a]). This standard effectively sums up all of the various “definitions” of merchantable quality since the principal function of the warranty of merchantability has been to give legal effect to a buyer’s reasonable expectations based on trade understanding of the quality of goods normally supplied under such a contract. (51 NY Jur, Sales, § 176.)
The second through sixth tests of merchantability, set out in section 2-314 of the Uniform Commercial Code, are as follows: the goods must be at least such as:
“(b) in the case of fungible goods, are of fair average quality within the description; and
“(c) are fit for the ordinary purposes for which such goods are used; and
“(d) run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
“(e) are adequately contained, packaged, and labeled as . the agreement may require; and
“(f) conform to the promises or affirmations of fact made on the container or label if any.”
Any exclusion or modification of the implied warranty of merchantability must expressly mention merchantability and, in case of a writing, be conspicuous. (See Uniform *616 Commercial Code, § 2-316, subd [2].) Since the written contract of sale here did not conform with this requirement, it must be deemed to carry with it such a warranty.
Would a dog with one undescended testicle pass without objection in the trade? A review of some of the authoritative case law may be instructive. In Sessa v Riegle (427 F Supp 760, affd 568 F2d 770), a buyer of a race horse (Tarport Conaway) brought an action against the seller to recover for breach of an express warranty and implied warranties after the horse was found to suffer from tendinitis and thrombosis of the iliac arteries causing intermittent claudication. The court found for the seller. With respect to the contention that the implied warranty of merchantability was breached, the court said (p 770): “Even with tendinitis and intermittent claudication Tar-port Conaway met this standard. The tendinitis was merely temporary and of no long term effect. The intermittent claudication did not prevent him from becoming a creditable if unspectacular race horse. After rest and recuperation, he won three races in thirteen starts in 1975. Certainly he did not live up to Sessa’s hopes for a preferred pacer, but such disappointments are an age old story in the horse racing business. Anyone who dares to deal in standardbreds knows that whether you pay $2500.00 or $250,000.00, a given horse may prove to be a second Hambletonian or a humble hayburner. Consequently, since Tarport Conaway was able to hold his own with other standardbreds, he was reasonably fit for the ordinary purposes for which race horses are used, and was merchantable.” (See, also, Agoos Kid Co. v Blumenthal Import Corp., 282 Mass 1, 6.)
Unlike the condition in Sessa v Riegle (supra), the condition here is apparently permanent and would be passed on to future generations of Mr. Dunphy’s offspring. Under the circumstances, I believe it to be a reasonable conclusion that a unilateral cryptorchid would not pass without objection in the trade. I conclude that Mr. Dunphy was not a merchantable dog.
The next issue to be resolved here is whether the warranty of fitness for a particular purpose has been breached. Sections 2-314 and 2-315 of the Uniform Commercial Code *617 make it clear that the warranty of fitness for a particular purpose is narrow, more specific, and more precise than the warranty of merchantability which involves fitness for the ordinary purposes for which such goods are used. (See White and Summers, Uniform Commercial Code [2d ed], § 9-9, p 357.)
Section 2-315 of the Uniform Commercial Code reads as follows: “Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller’s skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose.” The following are the conditions that are not required by the implied warranty of merchantability but that must be present if a plaintiff is to recover on the basis of the implied warranty of fitness for a particular purpose:
(1) The seller must have reason to know the buyer’s particular purpose.
(2) The seller must have reason to know that the buyer is relying on the seller’s skill or judgment to furnish appropriate goods.
(3) The buyer must, in fact, rely upon the seller’s skill or judgment.
Nevertheless I find that the warranty of fitness for a particular purpose has also been breached. Ms. Dempsey testified that she specified to the salesperson at American Kennels that she wanted a dog that was suitable for breeding purposes. Although this is disputed by the defendant, the credible testimony supports Ms. Dempsey’s version of the event. Further, it is reasonable for a seller of a pedigree dog to assume that the buyer intends to breed it. But, it is undisputed by the experts here (for both sides) that Mr. Dunphy, with only one descended testicle, was as capable of siring a litter as a male dog with two viable and descended testicles. This, the defendant contends, compels a finding in its favor. I disagree. While it is true that Mr. Dunphy’s fertility level may be unaffected, his stud value, because of this hereditary condition (which is likely to be passed on to future generations) is severely diminished.
*618 The fact that Mr. Dunphy’s testicle later descended and assumed the proper position is not relevant. “The parties were entitled to get what they bargained for at the time that they bargained for it. The right of the buyer to rescind must be determined as of the time the election to rescind was exercised. The parties’ rights are not to be determined by subsequent events.” (White Devon Farm v Stahl, 88 Misc 2d 961, 963.) White Devon Farm (p 961) involved the “tale of a stud who was a dud.” The court there (Greenfield, J.) held that the warranty of fitness for a particular purpose was breached despite the fact that the. horse’s fertility later rose and the stallion sired 27 live foals.
Finally, an examination or an opportunity to examine the disputed goods may result in a denial of the warranty claim. Section 2-316 (subd [3], par [b]) of the Uniform Commercial Code states:
“(3) Notwithstanding subsection (2) * * *
“(b) when the buyer before entering into the contract has examined the goods or the sample or model as fully as he desired or has refused to examine the goods there is no implied warranty with regard to defects which an examination ought in the circumstances to have revealed to him”.
The comment to this section emphasizes the importance of “[t]he particular buyer’s skill and the normal method of examining goods in the circumstances”. (Uniform Commercial Code, § 2-316, Comment 8.) As a recognized authority states: “The comment then suggests a distinction between professional and nonprofessional buyers. For example, a governmental agency buying magnetic tape or a farmer purchasing feeder pigs will be held to have assumed the risk for any defects that professionals in their respective fields should have discovered upon examination. On the other hand, a layman purchasing an automobile cannot be expected to be able to discover subtle mechanical and design defects. Absent unusual circumstances, we expect that most courts would be reluctant to find that an examination by a consumer has excluded all implied warranties.” (White and Summers, op. cit., § 12-6, p 452.)
The question posed then was Mr. Dunphy’s condition a defect capable of being discovered by a consumer? Ms. *619 Dempsey testified that she had previously owned two poodles. Their gender is not known. Nor is it known how thorough an examination she gave Mr. Dunphy prior to purchase. Although five days after sale, her veterinarian determined the condition, it is unclear if she ought to have discovered the condition herself. There were no evident warnings that Mr. Dunphy had one undescended testicle. This condition appears not to have been readily observable to Ms. Dempsey. A manual manipulation of the scrotal area would appear to be the only means of properly verifying this condition. I find that Ms. Dempsey did not know of this, nor should she be chargeable with knowledge of this fact.
In short, I hold that the type of examination that would be undertaken by a casual buyer (such as Ms. Dempsey) of a male puppy during the period leading up to sale is not of a nature which would under normal and reasonable circumstances, lead a consumer to manually manipulate the scrotal area, thereby possibly determining that one testicle was undescended. That being said, my holding that the implied warranty of merchantability has been breached remains intact.
Ms. Dempsey’s decision to revoke her acceptance and return Mr. Dunphy to the defendant was proper under section 2-608 of the Uniform Commercial Code. That section provides:
“(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it * * *
“(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller’s assurances.
“(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it”.
Here the claimant established that the defendant’s breach of the implied warranties substantially impaired the value of Mr. Dunphy to her because his stud value had been diminished and his condition was one that would be considered “objectionable” within the trade. Ms. Dempsey *620 further established that she discovered the dog’s “nonconformity” at a reasonable time because, due to the nature of the defect, it was difficult, if not impossible, to uncover it any earlier.
Finally, I find that the return of Mr. Dunphy to the defendant was done promptly after her discovery of the dog’s condition.
The next issue is the amount of damages which the claimant is entitled to recover.
Section 2-711 of the Uniform Commercial Code provides in pertinent part:
“(1) Where the seller fails to make delivery or repudiates or the buyer rightfully rejects or justifiably revokes acceptance then with respect to any goods involved, and with respect to the whole if the breach goes to the whole contract (Section 2-612), the buyer may cancel and whether or not he has done so may in addition to recovering so much of the price as has been paid
“(a) ‘cover’ and have damages under the next section as to all the goods affected whether or not they have been identified to the contract; or
“(b) recover damages for non-delivery as provided in this Article (Section 2-713).”
Ms. Dempsey did not attempt to “cover” by buying a substitute dog with all parts intact. Nor has she alleged that she suffered consequential damages as a result of the defendant’s breach. Instead, she requests only the refund of her purchase price. Under subdivision (1) of section 2-711 she is entitled to this. Therefore, a judgment for the claimant in the amount of $541.25 shall be entered by the clerk.