## TANYA WORRELL ET AL. *v.* RICKY SACHS

SUPERIOR COURT    JUDICIAL DISTRICT OF    FILE No. 272077
NEW HAVEN

Memorandum filed February 8, 1989

*Gallagher, Gallagher & Calistro,* for the named plaintiff.

*McNerney, Fitzgerald & Tiernan,* for the defendant.

SAMUEL S. FREEDMAN, J. This case presents a novel question: Is a pet animal a "product" under Connecticut's product liability law, General Statutes § 52-572m et seq.?

The complaint alleges serious eye damage and loss of sight by a child resulting from exposure to a diseased, parasite-carrying puppy purchased by the child's mother from the defendant's pet shop. The defendant moves to strike, arguing that a dog is not a product within the meaning of § 52-572 et seq. of the General Statutes.

"Product" is not defined by that law. Nor are there relevant Connecticut cases. Other jurisdictions which considered the issue have split.

The defendant relies on Illinois cases and a federal case in which the courts disapproved applying product liability laws to a transaction involving live animals. Noting the changing nature of living creatures which constantly interact with their environment, the courts in *Whitmer* v. *Schneble,* 29 Ill. App. 3d 659, 331 N.E.2d 114 (1975), and in *Anderson* v. *Farmers Hybrid Cos.,* 87 Ill. App. 3d 493, 408 N.E.2d 1194 (1980), concluded that this prevents the inclusion of animals within the theory advanced by § 402A of the Restatement (Second) of Torts. Product liability, they argue, requires that products reach the consumer without change from their condition at the time of sale.

The approach of the Illinois courts appears to prove too much. This court believes these cases inadequately analyze the interrelationship between mutability and product status. See note, "The Applicability of Strict Products Liability to Sales of Live Animals," 67 Iowa L. Rev. 803 (1982).

While § 402A makes mutability of the product highly significant on the issue of liability in any particular case, it does not speak to the question of product status. Since liability provisions require that the product reach the consumer without substantial change in its condition, a plaintiff cannot prove a case under this theory in the face of such change. But it does not necessarily follow logically that inability to prove a case because of mutability means that an animal is not a product at all. Rather it means that liability may not attach to that particular product. The argument confuses proof of liability with status.

Not all product change provides exemption—only substantial change. Moreover, General Statutes § 52-572*l* et seq. and analogous product statutes do apply to products which are susceptible to a change in character over time (e.g., food products, pressurized bottles, etc.). The Restatement[1] and product liability statutes clearly anticipate and make provision for the effects of a change in character; see, for instance, General Statutes § 52-572p ("[l]imitation of liability of product seller"); note, supra, 67 Iowa L. Rev. 803; providing for exemption from liability in applicable cases. Without doubt, a product can undergo sufficient change that its seller will be shielded from strict liability in tort. See *Hanlon* v. *Cyril Bath Co.*, 541 F.2d 343 (3d Cir. 1975); *Hawkeye-Security Ins. Co.* v. *Ford Motor Co.*, 174 N.W.2d 672 (Iowa 1970).

On the other hand, it is entirely possible that in a given case, expert opinion can establish that because of the stage in which a disease appears, the animal must have been similarly infected prior to sale. Thus, externally caused change may be testimonially eliminated as an exemption. Similarly, a rider thrown by a horse suffering from an inadequately healed leg fracture dat-

[1] The product "is expected to and does reach the user or consumer without substantial change in the condition in which it is sold." 2 Restatement (Second), Torts § 402A, comment 8 (defective condition).

ing to a time prior to sale might logically oppose any attempt to defeat his claim grounded upon a mutability argument. See note, supra, 67 Iowa L. Rev. 803.

In *Kaplan* v. *C Lazy U Ranch,* 615 F. Sup. 234, 236 (D. Colo. 1985) where a dude ranch client was injured by an unruly horse, the court held that generally, living things are not "products" within the scope of the doctrine of strict tort liability which requires that a product's nature be fixed when it leaves the seller's control. The case is distinguishable. A *diseased condition* of an animal is a defect more relevant to an animal as a product than is an animal's *behavior,* which is not a condition inherent in the animal but a response to any number of environmental factors. *Kaplan* is inapposite to the facts of this case.

In two fairly recent cases courts have found that a live animal is a product for purposes of product statutes, and both cases concern *pets* sold to consumers. In the first, a New York case, *Beyer* v. *Aquarium Supply Co.,* 94 Misc. 2d 336, 337, 406 N.Y.S.2d 778 (1977), the court held: "[T]here is no reason why a . . . vendor who places a diseased animal in the stream of commerce should be less accountable for his action than one who markets a defectively manufactured product. The risk presented to human well-being by a diseased animal is as great and probably greater than that created by a defectively manufactured product. . . ." This court finds it hard to argue with this enunciation of public policy.

In *Sease* v. *Taylor's Pets,* 74 Or. App. 110, 700 P.2d 1054, rev. denied, 299 Or. 584, 704 P.2d 514 (1985), the court based its determination on two rationales. First, that the statute provided a defense for defendants whose products had undergone substantial change after sale. Second, that the purpose of the statute to provide more certain protection to consumers injured by defective products was appropriate for *pets,* where diseased conditions might not be apparent to consumers.

Because the present case involves injury to a consumer by a diseased pet, the reasoning of *Beyer* and *Sease* are persuasive. The New York and Oregon decisions provide a realistic guide for determining the issue before us.

The court is mindful that Connecticut's public policy has already developed in this direction. The Uniform Commercial Code recognizes that animals are "goods." In General Statutes § 42a-2-105, the legislature set forth that " 'Goods' also includes the unborn young of animals and growing crops. . . ." The case law bears this out. See *Alpert* v. *Thomas,* 643 F. Sup. 1406 (D. Vt. 1986) (Arabian stallion); *Clifton Cattle Co.* v. *Thompson,* 43 Cal. App. 3d 11, 117 Cal. Rptr. 500 (1974) (cattle); *Key* v. *Bagen,* 136 Ga. App. 373, 221 S.E.2d 234 (1975) (horse); *Vince* v. *Broome,* 443 So. 2d 23 (Miss. 1982) (cattle); *O'Shea* v. *Hatch,* 97 N.M. 409, 640 P.2d 515 (1982) (horse); *Dempsey* v. *Rosenthal,* 121 Misc. 2d 612, 468 N.Y.S.2d 441 (1983) (pet poodle); *Bazzini* v. *Garrant,* 116 Misc. 2d 119, 455 N.Y.S.2d 77 (1982) (bird); *Aube* v. *O'Brien,* 140 Vt. 1, 433 A.2d 298 (1981) (cattle).

In Public Acts 1988, No. 88-325, codified as General Statutes § 22-344b, the so-called "Pet Lemon Law," the legislature clearly addresses pets as consumer products. This act requires pet store owners to perform periodic physical examinations upon pets in their custody and holds sellers responsible for diseased pets. Financial responsibility under the act is limited to the cost of the pet and does not extend to injuries to the buyer. Since the legislature is presumed to know the law, it can be argued that it did not also provide for injuries caused by the pet since that was already covered under the product liability law. In any event, the legislature holds pets to be products, and correspondingly, consumers may need protection from them.

This court finds that a pet, under the circumstances of this case, is a product within the meaning of Connecticut's product liability laws.[2]

The motion to strike is denied.

[2] The court notes the practical approach proposed by the note, "The Application of Strict Products Liability to Sales of Live Animals," 67 Iowa L. Rev. 803, 821 (1982), which argues that a rebuttable presumption of inapplicability will permit compensation when the claimant can show that the pet's mutability did not significantly contribute to the defect.