Padgett v Winslow (2025 NY Slip Op 50895(U))

[*1]

Padgett v Winslow

2025 NY Slip Op 50895(U)

Decided on April 18, 2025

City Court Of Binghamton, Broome County

Genute, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on April 18, 2025
City Court of Binghamton, Broome County

Brian and Nicole Padgett, Plaintiffs

against
Melissa Winslow &commat; Melrose Pet Palace, Defendants

Docket No. SC-132970-24

Plaintiffs by Brian Padgett and Nicole Padgett, Pro Se
Defendants by Aswad and Ingraham, LLP; Thomas A. Saitta, Esq. appearing

Michael J. Genute, J.

Background
In their complaint, filed with the Court on August 22, 2024, the plaintiffs seek $5,000.00 for costs and expenses associated with their purchase and subsequent veterinary care for their puppy, Bentley, who was purchased from the defendant, business.[FN1]
The plaintiffs allege in their complaint that Bentley started showing clear signs of significant illness 4 days after taking it home from the defendant business, that they followed the course of action recommended by the defendant store employee(s), that the defendant Winslow agreed to reimburse them for the first 24 hours of care at the Cornell University Hospital for Animals (hereinafter "CHA") and are seeking full compensation for the purchase price of Bentley, for all veterinary expenses, and for their multiple trips to Cornell which were necessary for the care of their new puppy. 
Mr. Padgett was the sole witness for the plaintiffs, while Ms. Winslow, owner of the defendant store, and store employee Nicholas Oley testified for the defendant. 
Multiple exhibits were offered and received on behalf of both parties. For the plaintiffs, the Court received the following exhibits:
• Pictures of an ill Bentley, including one next to a puddle of vomit;
• CHA Discharge Summary;
• The receipt from the defendant store for Bentley
• BAC Invoice
• CHA Invoice, along with a "Visit Summary" and "Instructions for Home Care"
For the defendants, the following exhibits were received: 
• "The Sale of Dogs and Cats Notice" provided to the plaintiffs at the time of purchase of Bentley;
• Bulleted checklist for the plaintiffs as purchasers of Bentley, inclusive of the defendant store's "48-hour return policy";
• $900 Check written out for Brian Padgett;
• BAH Invoice;
• CHA Clinics Notes/Specifics and Finalized Report
• BAC Veterinary Health Certificate, dated 7/23/24.
Testimony and Evidence
The facts are fairly straight-forward and not significantly disputed. The plaintiffs purchased Bentley (born on May 9, 2024. see D-F), a Yorkshire Terrier, from the defendant store on Friday, August 9th 2024. They were provided paperwork, inclusive of store policy by the defendant store employee(s) and, as admittedly new dog owners, were very careful to follow all of the instructions provided. Those instructions included keeping their new puppy isolated in their home until they were able to make arrangements to finish its vaccination schedule which, because of his age, they were told by the store employee(s) were not complete.
Bentley slept a lot once he was brought home by the plaintiffs, which they as inexperienced dog owners chalked up to him just being a puppy. On Tuesday, August 13th, they noticed that Bentley was becoming lethargic. Around midnight of that same evening, Bentley vomited dark brown liquid and vomited several more times by the next morning. Being naturally alarmed, the plaintiffs contacted the defendant store by phone Wednesday morning, and were advised to bring the puppy to the Binghamton Animal Clinic (BAC), where Bentley was taken for his first physical and initial vaccines while in the care of the defendant store. While there, the puppy tested negative for Parvovirus via a rapid test, and was sent home with suggestions to potentially change the puppy's food, along with some other supplies for the puppy. (see Ex. P-5). At the time, the plaintiffs were very concerned that Bentley may not survive. 
After Bentley was discharged from the BAC that same Wednesday, Mr. Padgett again contacted the defendant store and spoke with an employee. According to Mr. Padgett, he was advised to bring the puppy to another veterinarian for a second opinion. Without any success in making contact with any local options for an emergency visit, the plaintiffs contacted CHA. Seeing the puppy deteriorate further, the plaintiffs made arrangements with CHA the following morning, which required a $3000 down payment. With this, Mr. Padgett reached out to the defendants, eventually speaking with the owner of the store, Ms. Winslow, and asked if she would agree to cover the first 24 hours of Bentley's care at CHA. According to Mr. Padgett, Ms. Winslow agreed that the store would cover the first 24 hours of the visit and would wait and see how things progressed. According to Ms. Winslow's testimony, she never agreed to this, merely telling the Mr. Padgett to see how things went and offering that he could return the puppy and that the defendants would take over care of the puppy, which the plaintiffs declined. She specifically recalled Mr. Padgett stating that he did not care how much it would cost to get Bentley back home, which Mr. Padgett did not deny.
The puppy was eventually diagnosed with Parvovirus (see Ex. D-D; P-6 "Finalized Report") and with treatment was eventually cured, following multiple days of care at CHA. The following week, Mr. Padgett again spoke with Ms. Winslow asking about reimbursement. Ms. Winslow offered to pay $800, which was the cost of Bentley, and Mr. Padgett inquired of the additional cost to include taxes. Ms. Winslow noted that the taxes have already been accounted [*2]for and collected by the government, but agreed to pay the plaintiffs $900.00 for their troubles.[FN2]

When Mr. Padgett arrived at the store to pick up the $900 check, the store employees asked for documentation of the positive Parvovirus test. Mr. Padgett was frustrated by this, because he claimed he did not know he needed to bring any proof. Based upon the testimony, it is clear that things became somewhat adversarial with Mr. Padgett frustrated with the entire experience and hoping to just collect the $900, offering to e-mail the positive Parvovirus test subsequent to picking up the check. Once this suggestion was declined by the defendant store employees, the situation escalated to the point where Mr. Padgett was escorted out of the store without the check and again told that he needed to bring documentation of the positive Parvovirus test in order to receive the check. Instead, the plaintiffs elected to file the current small claims action against the defendant.
Analysis
In small claims cases, the plaintiff bears the burden of proving a claim by a preponderance of the evidence. The court has the obligation to apply the facts to the relevant law, keeping in mind the statutory mandate of substantial justice (UCCA §1804).
While "small claims matters are not bound by the rules of evidence, a determination may not be based solely on hearsay." (Rowe v. Silver & Gold Expressions, 968 NYS2d 202, 203 [3 Dept. 2013] [citation omitted]). "Even at Small Claims, with its relaxed rules of procedure and evidence, the fundamental right to confront a witness by cross-examination must be preserved." (Falker v. Chrysler Corp., 119 Misc 2d 375, 378 [Civ. Ct. 1983] [citation omitted]).
Regarding the purchase of animals, General Business Law § 753 provides as follows [FN3]
:
1. If, within fourteen business days following the sale of an animal subject to this article . . . a veterinarian of the consumer's choosing, licensed by a state certifies such animal to be unfit for purchase due to illness or the presence of symptoms of a contagious or infectious disease . . . the pet dealer shall afford the consumer the right to choose one of the following options:
(a) The right to return the animal and receive a refund of the purchase price including sales tax and reasonable veterinary costs directly related to the veterinarian's certification that the animal is unfit for purchase pursuant to this section;
(b) The right to return the animal and to receive an exchange animal of the consumer's choice of equivalent value and reasonable veterinary costs directly related to the veterinarian's certification that the animal is unfit for purchase pursuant to this section; or
(c) The right to retain the animal and to receive reimbursement from a pet dealer for veterinary services from a licensed veterinarian of the consumer's choosing, for the purpose of curing or attempting to cure the animal . . . However, "the remedy provided under § 753 is not exclusive (and) . . . a purchaser may recover under the alternative claim of breach of the implied warranty of merchantability." (Budd v Quinlan, 860 NYS2d 802, 803 [App Term 2008], citing UCC § 2-314). Moreover, (d)ogs have been held to constitute 'goods' within the meaning of § 2—105 of the Uniform Commercial Code. (Id., citing Saxton v. Pets Warehouse, 180 Misc 2d 377, 691 NYS2d 872 [App. Term, 9th & 10th Jud. Dists. 1999]; see also Badillo v Bob's Tropical Pet Ctr., Inc., 980 NYS2d 274, 2013 NY Slip Op. 51386(U) *1 [App Term 2013]).
"Here, plaintiff(s) cannot avail (themselves) of (GBL § 753) as (they) did not comply with the requirements set forth in (the statute) — namely acquiring a certification from a licensed veterinarian that (Bentley) was not fit for purchase." (Buckner v Demling, 212 NYS3d 815, 2024 NY Slip Op. 50857(U) *2 [Civ Ct 2024]). However, the Uniform Commercial Code permits plaintiffs' recovery beyond the remedies of GBL § 753. (Id., citing Saxton v Pets Warehouse, Inc., 180 Misc 2d at 378). As such, "(t)he purchaser of an unhealthy animal may recover damages pursuant to UCC § 2-714 on the theory that a merchant seller breached the warranty of merchantability." (Id. [citations omitted]). Under such a theory, the plaintiffs would be ". . . entitled to recover damages, including consequential damages, under a theory of breach of the implied warranty of merchantability. (Flood v Bulldogs of Long Is., Inc., 174 NYS3d 537 2022, NY Slip Op. 50917(U) *1 [App Term 2022], citing UCC § 2-314; 2-714; 2-715 [other citations omitted]).
Applying the Uniform Commercial Code (see UCC § 2-714; 2-715), there still has to be reliable proof supported by a preponderance of the evidence that the puppy was defective when it left the defendant store. In this regard, the plaintiffs presented the following evidence:
• Bentley was sleeping a lot from the day he arrived at the plaintiffs' house following his purchase from the defendant store [FN4]
;
• There was substantial manifestation of Parvovirus symptoms on the fourth day since he was purchased;
• Mr. Padgett's testimony concerning the care that the plaintiffs took to protect Bentley from any exposure, which included keeping him in their house and from going outside, even in their yard;
• The positive PCR test for Parvovirus taken from Bentley's stool on the sixth day since he was brought home. (see Ex. P-6).
With this information, the Court finds that the plaintiffs have met their burden to demonstrate that they purchased a product that had a defect when it left the defendant store.
In response, Ms. Winslow, who has been in the dog industry for several years as a vet tech, surgical tech, dog groomer, and now owner of the defendant store since May of 2024, [*3]offered that Parvovirus has an incubation period of only 3-4 days. Ms. Winslow further posited that no other dogs that were housed with Bentley at her business contracted Parvovirus, that he had a clean bill of health from BAC from an examination on July 23, 2024, and that he appeared healthy when he was sold to the plaintiffs. The defendant did not offer any specific vaccination records rebutting the possibility that Bentley was released without the adequate protections offered by up-to-date vaccines or otherwise better explaining why the defendant store advised Mr. Padgett that Bentley was too young and small to have been more along with the vaccination schedule. In fact, the vaccine schedule was not at all addressed by Ms. Winslow during her testimony, and Mr. Padgett's testimony concerning the need for the plaintiffs to complete Bentley's vaccination schedule or the warnings about keeping him isolated were not at all disputed.
With this, the Court finds that the testimony by Ms. Winslow that the incubation period for Parvovirus is 3-4 days is both self-serving and lacking in credibility. (see DiPalma v. State, 936 NYS2d 464, 465 [4 Dept. 2011]; see also Phelps v. Phelps, 666 NYS2d 817, 818 [3 Dept. 1997]). The documentation from the Cornell Animal Hospital cites that "clinical signs (of Parvovirus) usually appear within 7 days of infection." (see Ex. P-6 ["Visit Summary"]).
In light of the uncontroverted testimony offered by the plaintiffs, the Court finds that the defendant has simply failed to rebut the evidence presented by the plaintiffs. This is all the more troubling when considering the credibility concerns noted with Ms. Winslow's testimony, which conveniently is not consistent with the clearly prevalent information that it can take up to 7 days to manifest, and possibly even more.
The Court further notes the instructions provided to the plaintiffs regarding Bentley, providing that "(t)he puppy you are purchasing has received its first set of shots and a vet check-up. It will be your responsibility to have further shots and future vet check-ups as recommended by your veterinarian." see D-B. Mr. Padgett also testified regarding the instructions provided at the defendant store at the time of Bentley's purchase, that it would take 2 weeks to complete Bentley's vaccinations as he was too small and young for the defendant store to have finished his vaccination.
The literature/information provided by CHA indicates that Parvovirus is highly contagious, providing that the "virus is very resistant and survives for years in the environment", while recommending in their information sheet that the plaintiffs use "bleach to wash all surfaces to which your dog has been exposed, to minimize the risk of infection to another dog in the household." (see Ex. P-6 "Instructions for Home Care"). In this regard, the Court is left to wonder which vaccinations were given and if there was a reason from the defendant's perspective why Bentley's Parvovirus vaccination or other vaccinations were not more complete.
While the defendant had an opportunity to present evidence and testimony concerning the measures taken by the defendant store to protect Bentley, this was simply not done. The Court finds this problematic and suggestive that the puppy sold to the plaintiffs was inadequately protected from catching a very contagious and dangerous disease by appropriate vaccinations. Leaving this obligation upon new pet owners unfamiliar with dog ownership is indicative of a breach of care and good faith dealing, especially considering Mr. Padgett's credible testimony that the plaintiff did not allow the dog in his yard or anywhere outside of his house or vehicle for transport, negating possible alternative explanations as to how Bentley was infected with the Parvovirus.
Separately, the plaintiffs proffer that the defendant agreed to reimburse them for the first [*4]24 hours of care at the CHA, arguing that there was an enforceable agreement or promise based upon Ms. Winslow's alleged remarks. "In order to prevail on a theory of promissory estoppel, a party must establish (1) a promise that is sufficiently clear and unambiguous; (2) reasonable reliance on the promise by a party; and (3) injury caused by the reliance." (Condor Funding, LLC v 176 Broadway Owners Corp., 46 NYS3d 99, 101 [1st Dept 2017] [citations omitted]).
In this case, the plaintiffs further established that there was a clear and unambiguous promise. Mr. Padgett clearly and credibly testified that Ms. Winslow agreed to pay for the first 24 hours of care and to see how things go from there. Ms. Winslow denied the assertion that she agreed to pay for the first 24 hours, but instead offered Mr. Padgett to return the puppy for a refund or to exchange for another puppy, which she testified was rejected by the Mr. Padgett. While Mr. Padgett's testimony was not consistent with Ms. Winslow's testimony in this regard, there was no denial of Ms. Winslow's testimony that Mr. Padgett stated that he did not care how much it would cost to get Bentley back home, which makes perfect sense to the Court as the plaintiffs clearly and quickly developed a very strong bond with their new puppy. 
While the Court certainly can and does make a credibility determination in Mr. Padgett's favor regarding Ms. Winslow's representations concerning the first 24 hours of care, the Court does not find that the plaintiff reasonably relied upon these representations to their detriment. Consistent with the testimony, the Court finds that the plaintiffs would have provided the proper care for Bentley regardless of Ms. Winslow's response, and such action should certainly be encouraged. (see Roberts v Melendez, 800 NYS2d 355, 2005 NY Slip Op. 50047[U] [Civ Ct 2005])[FN5]
. Without there being detrimental reliance on Ms. Winslow's representation, there can be no separate finding that the plaintiffs would be entitled to a judgement based on the theory of promissory estoppel.
While Ms. Winslow testified to the plaintiffs' acknowledgement of the defendant's store "48-hour return policy" providing that "(r)efunds will be provided in store credit only" (see D-B), this acknowledgement certainly does not trump the defendants' obligation to sell their puppies free of defects, as the Court finds that it is both unreasonably in light of the circumstances (see UCC § 2-316), but also that it does not make any mention of "merchantability" in its attempt to limit the plaintiffs' right of recovery. (see Dempsey v Rosenthal, 468 NYS2d 441, 444 [Civ Ct 1983], also relying on UCC 2 § 316; see also Zicari v Joseph Harris Co., 304 NYS2d 918, 924, 925 [4th Dept 1969], applying UCC § 2-316 and UCC § 2-719). Finally, the Court also finds that limiting recovery for "unforeseen occasions" or otherwise for a dog sold in a defective condition to a "store credit" is simply unconscionable. (see UCC § 2-719[3]). As such, the defendants' argument that the store policy limited the plaintiffs' right of recovery is hereby rejected.
Keeping in mind the statutory mandate of substantial justice and for all these reasons the Court finds that the plaintiffs are entitled to judgment for the amount of their veterinarian costs associated with the emergency care for Bentley at both CHA ($3624.94) and BAC ($253.35), but will not consider any additional costs of transportation or the like as there was a lack of specific testimony concerning these potential additional damages. (see Brodeur v Hayes, 795 NYS2d [*5]761, 763 [3d Dept 2005] [citations omitted]). As such the plaintiffs are entitled to damages in the amount of $3878.29.
Decision
Plaintiffs are awarded Judgment in the amount of $3878.29, plus court costs, as against the defendants, Melissa Winslow and Melrose Pet Palace. The foregoing constitutes the Decision and Order of the Court.
Dated: April 18, 2025
Hon. Michael J. Genute
Acting Binghamton City Court Judge

Footnotes

Footnote 1:The complaint initially included "Joe Pickering", but the defendant Melissa Winslow represented that she was the sole owner of the store, so Mr. Pickering was removed from the complaint.

Footnote 2:CPLR 4547 provides that evidence regarding settlement negotiations is "inadmissible as proof of liability for or invalidity of the claim or the amount of damages . . ." (Matter of Town of Waterford v New York State Dept. of Envtl. Conservation, 906 NYS2d 651, 659 [3d Dept 2010]). As such, the defendants' offer of settlement cannot be considered for any determination of liability or damages.

Footnote 3:The statutory language was provided to the plaintiffs as part of their paperwork during their purchase of Bentley. (see D-A).

Footnote 4:Notably absent from Mr. Padgett's testimony was that Bentley had any spurts of energy alternating with his tendency to sleep a lot.

Footnote 5:A decision that relied on a veterinarian's letter concluding that the puppy was infected with Parvovirus at the time of purchase based upon a "prepatent period of 5-7 days". (2005 NY Slip Op. 50047[U] *2.