Filed 6/24/20

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| ANDREW J. PANKEY, | D072779 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2014-00004156-CU-PO-CTL) |
| PETCO ANIMAL SUPPLIES, INC., | |
| Defendant and Respondent. | |


APPEAL from a judgment of the Superior Court of San Diego County, Eddie C. Sturgeon, Judge. Affirmed.

Gomez Trial Attorneys, John H. Gomez, Bibianne U. Fell; Higgs Fletcher & Mack, John Morris, and Rachel E. Moffitt for Plaintiff and Appellant.

Horton, Oberrecht, Kirkpatrick & Martha, Kimberly S. Oberrecht; Greines, Martin, Stein & Richland, Robert A. Olson, Cynthia E. Tobisman, and Eleanor A. Ruth for Defendant and Respondent.

INTRODUCTION

Plaintiff Andrew J. Pankey (Andrew) filed a products liability claim against Petco Animal Supplies, Inc., after his son Aidan contracted a rare bacterial infection from a rat

purchased at Petco. Aidan later died as a result of complications related to his infection. Andrew alleged, among other things, that Petco was strictly liable for injuries resulting from the sale of the pet rat, which he argued was a product for purposes of strict products liability. The trial court instructed the jury on negligence under ordinary negligence and negligent failure-to-warn theories, as well as three theories of strict products liability: (1) failure to warn, (2) manufacturing defect, and (3) design defect under a risk-benefit test. The jury returned verdicts in favor of Petco.

On appeal, Andrew contends the trial court erred by refusing to instruct the jury on an alternative strict liability design defect theory, the consumer expectations test. He argues there was sufficient evidence from which the jury could have concluded the pet rat purchased from Petco failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner.

We conclude a live pet animal sold in its unaltered state is not a product subject to the design defect consumer expectations theory of strict products liability. Accordingly, we affirm. Because we affirm on this basis, we need not reach a conclusion regarding the applicability of the consumer expectations test or the prejudicial effect of its exclusion. Were we to do so, however, we would affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A.    *Aidan Pankey*

In May 2013, 10-year-old Aidan Pankey and his grandmother visited a Petco store to purchase a companion for Aidan's female pet rat. They selected and purchased a male

2

rat. Aidan kept his male rat in a vivarium at his grandmother's home, but he occasionally handled it outside the vivarium.

Two weeks after purchasing the male rat, Aidan developed a fever, grew increasingly lethargic, and at one point collapsed on the floor. Aidan's grandmother called an ambulance; Aidan passed away at the hospital shortly after he arrived.

The autopsy did not disclose a cause of death or any sign of a bite or scratch. However, analysis from Aidan's tissue samples revealed the presence of streptobacillus moniliformis, a bacteria carried by some rats. Analysis of blood and tissue samples taken from Aidan's rats revealed the bacteria was carried by the male rat, but not the female rat. The parties to this suit stipulated that Aidan's death resulted from rat bite fever (RBF), an infection caused by streptobacillus moniliformis.

B.     *Pretrial Proceedings*

Andrew and Aidan's mother, individually and as administrators of Aidan's estate, sued Petco and Barney's Pets, the exclusive supplier of pet rats for Petco's California stores during the relevant time frame, alleging negligence and strict products liability.

Petco moved for summary adjudication of the strict products liability cause of action on the basis that a pet rat is not a product. The court denied the motion, concluding a pet rat is a product for purposes of California's strict products liability doctrine.

Aidan's mother settled and dismissed her claims against the defendants.

3

C. *Trial*

Andrew's case proceeded to a jury trial on four theories: (1) negligence, (2) strict liability based on a warning defect, (3) strict liability based on a manufacturing defect, and (4) strict liability based on design defect.

1. *Streptobacillus Moniliformis*

Plaintiff's infectious disease expert, Dr. Joseph Vinetz, testified that 10 to 100 percent of wild rats carry the bacteria streptobacillus moniliformis. The bacteria is a commensal organism that has adapted to live in rats, but it "doesn't have to be" present in rats. Rats that carry streptobacillus moniliformis appear healthy and for the most part are, but they can transmit the bacteria to one another through direct contact or their environments, and they can transmit the bacteria to humans through bites and scratches, or through their saliva, feces, and urine.

In humans, streptobacillus moniliformis can cause RBF, which typically manifests itself in flu-like symptoms, a fever, a rash, and/or joint pain. Possible complications from RBF include endocarditis (a heart valve infection), meningitis (an infection of the lining of the brain), septic arthritis, and for 7 to 13 percent of untreated patients, death. Sometimes, RBF resolves on its own.

Dr. Vinetz testified it is "fairly simple" to breed pathogen-free rats that do not carry streptobacillus moniliforms, and he testified at least two laboratories had done so.[1]

---

[1] The chief operations officer from Barney's testified that he purchased pathogen-free rats from one of the laboratories Dr. Vinetz cited, Harlan Laboratories, but rats from that lab tested positive for the bacteria.

4

According to Dr. Vinetz, pathogen-free rats can be bred by (1) performing molecular testing to screen out carrier rats, (2) segregating noncarrier rats in a clean facility free from the bacteria where they are allowed to breed, (3) delivering the first-generation pups via caesarian section (to avoid a minimal risk of transmission through the placenta), (4) using noncarrier rats to feed new pups, and (5) permitting future generations of the pathogen-free pups to interbreed and give birth naturally.

Randall Buck, the vice president of operations for Barney's (exclusive provider of rats to Petco), testified that he attempted to breed pathogen-free rats. He set up a clean facility free from the bacteria, and he purchased rats from labs that provided documentation the rats had tested negative for the streptobacillus moniliformis. He testified that once the rats left their original lab environments, some of them seemed to have compromised immune systems and became ill. Although the labs provided documentation that the rats tested negative for the streptobacillus moniliformis, he was unsuccessful at purchasing rats that were 100 percent free from the bacteria. He testified that the only way to be certain a rat did not carry the bacteria was to euthanize the animal and test brain samples. He also testified that even if rats were bred in a lab to be free from the bacteria, they might not fare well in a pet store environment because their immune systems would be compromised. He based this belief on his own experience in trying to do it.

2.      *Petco's Policies and Practices*

Petco sells about 400,000 rats nationally every year. It makes periodic, unannounced visits to the facilities of its suppliers, including Barney's, to ensure that the

5

animals are cared for, clean, and well-fed.  Rats are not tested for streptobacillus moniliformis as part of these audits.  However, Petco requests that its suppliers provide rats that do not carry the bacteria.

Rats can be tested for streptobacillus moniliformis through molecular testing, called a PCR (polymerase chain reaction).  Petco does not tell customers the test is available, but if a customer asks, Petco will segregate the rat, swab its mouth, and send the swab for testing at Petco's expense.  It is not clear from the record how many customers have requested such testing, but Petco's vice president of veterinary medicine testified there were two instances he knew of when a customer had made such a request.  Petco will also test a rat if it bites someone.  Petco tested a total of 381 rats in 2013, the year Aidan died, and 196 of them, or 51.4 percent, tested positive for the bacteria.

If a rat bites someone and tests positive for streptobacillus moniliformis, Petco will euthanize the rat, inform the supplier about the test result, halt further sales of rats from the same batch (i.e., rats of the same size and gender as the carrier rat), and inform customers who have already purchased rats from the same batch about RBF and the positive test result.

Petco warns customers about streptobacillus moniliformis and the dangers of bacterial transmission in three ways.  First, a sign near the rat habitats entitled "Safe Small Animal Handling" states:  "All small animals can carry germs, which may infect humans."  Second, Petco posts "Care Sheets" near its rat habitats, advising customers that "all rats are potential carriers of infectious diseases, such as Rat Bite Fever . . . ."  Finally, at the point of sale it requires that customers who intend to buy animals sign a

6

Companion Animal Purchase Card, which attests that the customer has reviewed caution statements on the backside of the card.  One such caution statement advises customers of RBF, the means by which it can be transmitted to humans, and its flu-like symptoms.[2]

3.    *Consumer Expectations*

Andrew elicited testimony from Aidan's grandmother and several parents of children who contracted RBF from pet rats purchased from Petco over a period of more than a decade.  Aidan's grandmother testified she expected the pet she purchased to be healthy and safe for her grandson.  She was aware wild rats could carry disease, but she did not expect a pet she purchased from Petco to be carrying a deadly disease.  Other parents testified they believed rats purchased from Petco would be "disease free" and that Petco would sell rats that were "safe for children and families."  Parents also testified that they did not have any expectations about the biological makeup of the rat, that independent research about rats explained there was a chance of getting a disease or germs from rats, and that a few looked over the warnings, but "didn't exactly read all of them."

---

[2]    It reads:  "**Rat Bite Fever ('RBF')** is a bacterial infection transmissible to people from rats.  Rats are carriers of this bacterium and show no signs of illness, however, they can pass the bacteria on to people via bites, scratches, or accidental ingestion of contaminated rat feces.  This ingestion can take place by failing to wash your hands after having contact with the pet or its bedding.  Symptoms of infection will usually occur 2-10 days after exposure to an infected rodent and include abrupt onset of chills and fever, vomiting, pain in the back and joints, headaches and muscle pain.  A qualified physician can make the diagnosis of RBF based on symptoms and testing for the specific strain of bacteria causing RBF.  If a rat bite occurs it would be advisable to consult a physician."

4. *Jury Instructions and Special Verdict*

Over Andrew's objection, the trial court declined to instruct the jury on the consumer expectations test, a test by which a trier of fact may find a design defect if "the circumstances of the product's failure permit an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers." (*Soule v. General Motors* (1994) 8 Cal.4th 548, 568-569 (*Soule*).) The court opined it would be "too much" to expect a consumer to form minimum safety assumptions about a pet rat.

The trial court instructed the jury on the risk-benefit test for purposes of design defect theory. The risk-benefit test asks the trier of fact to determine whether the plaintiff has proved the product's design proximately caused his injury and, if so, whether the defendant has established that the benefits of the product's design outweigh the risk of injury inherent in such a design. (*Kim v. Toyota Motor Corp.* (2018) 6 Cal.5th 21, 30 (*Kim*).) The court also instructed the jury on other causes of action, including negligence, negligent failure-to-warn, strict liability failure-to-warn, and strict liability manufacturing defect.

The jury found in favor of defendants on all causes of action. On the negligent failure-to-warn claim, the jury determined that Petco knew or reasonably should have known that the pet rat was dangerous or was likely to be dangerous when used or misused in a reasonably foreseeable manner (11-1 vote), and that Petco knew or reasonably should have known users would not realize the danger (12-0 vote), but found no liability because Petco did not fail to adequately warn of the danger or instruct on the safe use of the pet

8

rat (10-2 vote).  The jury also returned a defense verdict on the ordinary negligence cause of action (12-0 vote).

The jury found in favor of defendants on each of the strict liability causes of action as well.  For the manufacturing defect claim, the jury decided the pet rat did not contain a manufacturing defect when it left defendants' possession (11-1 vote).  It also concluded there was no strict liability for a warning defect because, although the pet rat had potential risks that were known or knowable (11-1 vote), they did not present a substantial danger to persons using or misusing the pet rat in an intended or reasonably foreseeable way (10-2 vote).  Finally, the jury found Petco not liable for a strict liability design defect under the risk-benefit test because the risk of the pet rat's design did not outweigh its design benefits (9-3 vote).

Following entry of judgment, Andrew and Barney's settled.  As a result, this appeal only concerns the judgment in favor of Petco.

DISCUSSION

Andrew challenges the judgment contending the trial court erred by refusing to instruct the consumer expectations test as a theory on which the jury could conclude Aidan's pet rat had a design defect.  Petco offers three responses.  First, it argues the appeal is moot because Andrew did not appeal the judgment in favor of Barney's, and it has not been vacated.  Petco contends issue preclusion forecloses Andrew from relitigating some or all issues relating to the design defect claim.  Second, Petco argues a pet rat is not a product under the strict products liability doctrine.  Finally, Petco argues

9

the alleged design defect involves "novel and complex scientific matters" incapable of resolution under the consumer expectations test.

We conclude Petco has not demonstrated mootness on issue preclusion grounds. We further conclude a live pet sold in its natural form without modification does not constitute a product under California's strict products liability design defect doctrine. Because we conclude a pet rat is not a product for purposes of the strict products liability design defect, we need not reach the remaining issue of the propriety of the consumer expectations test, but were we to do so, we would conclude it was not improper for the court to refuse that jury instruction.

## I

## MOOTNESS

Petco contends the appeal is moot because the judgment entered in Barney's favor, which Andrew did not appeal, apparently due to the parties' postjudgment settlement, precludes Andrew from "relitigating" the issues against Petco. It maintains that under the

10

doctrine of issue preclusion, the final judgment precludes Andrew "from pursuing or continuing to pursue" a design defect theory of liability against Petco.[3]

We have some difficulty understanding the precise contours of Petco's issue preclusion argument. Petco does not articulate any particular issue it believes is subject to preclusion, instead vaguely contending the judgment in Barney's favor resolved undefined "strict liability issues" that, according to Petco, cannot be now relitigated. Because Petco does not identify the issue on which it bases this argument, we are inclined to deem Petco's argument waived. (*People ex rel. City of Santa Monica v. Gabriel* (2010) 186 Cal.App.4th 882, 887 ["Absent a more thorough explanation of this issue and its purported effect, we deem the argument waived."].)

Petco may be contending that the unappealed judgment in Barney's favor conclusively determined that Aidan's pet rat did not have a design defect; that was the position Petco took during oral argument. But even if that were the intent, we would reject the argument on its merits.

---

3       Petco sometimes indicates the judgment in Barney's favor precludes Andrew from relitigating a strict products liability *claim* against Petco. However, Petco relies on the doctrine of *issue* preclusion, not *claim* preclusion, as the basis for its mootness argument. "It is important to distinguish these two types of preclusion because they have different requirements." (*DKN Holdings LLC v Faerber* (2015) 61 Cal.4th 813, 824 (*DKN*).) Because Petco provides no analysis or legal authority to support a claim preclusion argument, we do not consider it. (*Road Sprinkler Fitters Local Union No. 669 v. G&G Fire Sprinklers, Inc.* (2002) 102 Cal.App.4th 765, 772, fn. 6 [claim preclusion argument raised for first time in appellate oral argument waived]; see *City of Santa Maria v. Adam* (2012) 211 Cal.App.4th 266, 286-287 [appellant must supply cogent argument supported by legal analysis; court may disregard arguments that fail to disclose appellant's reasoning].)

Issue preclusion "prohibits the relitigation of issues argued and decided in a previous case, even if the second suit raises different causes of action." (*DKN*, *supra*, 61 Cal.4th at p. 824.) It applies "(1) after final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit or one in privity with that party." (*Id.* at p. 825.)

Petco does not satisfy these requirements because Andrew did not litigate to decision a design defect claim based on the consumer expectations test. The court never offered the consumer expectations instruction; thus, the design defect issue that was actually and necessarily decided, the risk-benefits theory, is not identical to the design defect issue that Andrew asks to be addressed on remand. (*Curtis v. State of California ex rel. Dept. of Transportation* (1982) 128 Cal.App.3d 668, 685 [contributory negligence not actually litigated and decided in prior action because it was "specifically and deliberately taken away from the jury"].) Accordingly, the mootness argument lacks merit.

II

UNMODIFIED PET RAT IS NOT A PRODUCT

Petco next argues that the judgment should be affirmed because a live animal cannot be a "product" for purposes of strict liability.

A.      *Additional Facts*

Prior to trial, the defendants moved for summary adjudication on the ground that a living animal is not a product for the purposes of strict products liability. The parties briefed the issue, and the court denied the defendants' motion. The trial court explained:

12

"California courts have not addressed whether an animal is a 'product,' nor have they adopted the *Restatement* (*Third*) for products liability, notwithstanding it has been in existence since 1989."[4]

B.     *Products Liability:  General Principles*

Summary adjudication is properly granted when the moving party establishes the right to entry of judgment as a matter of law.  (Code Civ. Proc., § 437c, subd. (f).)  Whether a rat is a product for purposes of a strict products liability design defect cause of action is a legal question, which we review de novo.  (*Jacks v. City of Santa Barbara* (2017) 3 Cal.5th 248, 273; *Buss v. Superior Court* (1997) 16 Cal.4th 35, 60; *Bialo v. Western Mutual Ins. Co.* (2002) 95 Cal.App.4th 68, 76-77.)  We review the decision, not the court's rationale.  (*Bialo*, at p. 76.)

" 'Products liability is the name currently given to the area of the law involving the liability of those who supply goods or products for the use of others to purchasers, users, and bystanders for losses of various kinds resulting from so-called defects in those products.' "  (*Merrill v. Navegar*, *Inc.* (2001) 26 Cal.4th 465, 478.)  Liability attaches not only to manufacturers, but also to others in the vertical chain of distribution, including retailers, licensors, and wholesale and retail distributors.  (*Bay Summit Community Assn. v. Shell Oil Co.* (1996) 51 Cal.App.4th 762, 773.)

---

4     California courts have adopted various portions of the Restatement Third of Torts. (See *Johnson v. United States Steel Corp.* (2015) 240 Cal.App.4th 22, 31-33 (*Johnson*) [quoting the definition of "product"].)

13

"Strict liability has been invoked for three types of defects—manufacturing defects, design defects, and 'warning defects,' i.e., inadequate warnings or failures to warn."  (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995.)

"[T]he term defect as utilized in the strict liability context is neither self-defining nor susceptible to a single definition applicable in all contexts."  (*Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 427 (*Barker*).)  A product has a manufacturing defect if it "differs from the manufacturer's intended result or from other ostensibly identical units of the same product line."  (*Id.* at p. 429.)  A warning defect exists if the manufacturer does not adequately warn the customer "of a particular risk that was known or knowable in light of the generally recognized and prevailing scientific and medical knowledge available at the time of the manufacture and distribution."  (*Anderson v. Owens-Corning Fiberglas Corp.*, *supra*, 53 Cal.3d at p. 1002.)  A product has a design defect if it "fails to meet ordinary consumer expectations as to safety" or "the design is not as safe as it should be."  (*Barker*, at p. 432.)  Regardless of the theory, a plaintiff must establish "that the object or instrumentality claimed to be defective was in fact a 'product.' "  (*Brooks v. Eugene Burger Management Corp.* (1989) 215 Cal.App.3d 1611,

1626.)  We focus our analysis here on whether the rats Petco sells are products for purposes of design defect theory.[5]

California law has not addressed whether an animal is a product for purposes of strict liability.  However, both the Second and Third Restatements of Torts provide some guidance regarding what constitutes a product for strict liability claims, and whether we apply section 402A of Restatement Second of Torts (hereafter Second Restatement) or section 19 of the Restatement Third of Torts (hereafter Third Restatement), we reach the same conclusion:  a pet rat carrying the streptobacillus moniliformis bacteria is not subject to a products liability design defect claim.

" ' "The Restatement . . . does not constitute a binding authority, but, considering the circumstances under which it has been drafted, and its purposes, in the absence of a contrary statute or decision in this state, it is entitled to great consideration as an argumentative authority." ' "  (*Brady v. Calsol*, *Inc.* (2015) 241 Cal.App.4th 1212, 1225.)  Although California has not adopted the Third Restatement, California courts have in some circumstances cited approvingly to portions, including the definition of "product"

---

5       We requested supplemental briefing regarding whether the existence of streptobacillus moniliformis in rats, to the extent it could be considered a defect, is a manufacturing defect rather than one of design.  "In general, a manufacturing or production defect is readily identifiable because a defective product is one that differs [(1)] from the manufacturer's intended result or [(2)] from other ostensibly identical units of the same product . . . ."  (*Barker*, *supra*, 20 Cal.3d at p. 429.)  Both parties responded that the alleged failure of the product, if it is a defect, is a design defect and not a manufacturing defect.  Without offering any opinion on the question, we accept the parties' agreement for purposes of this appeal.

15

found in section 19. (*Johnson*, *supra*, 240 Cal.App.4th at p. 31; *Jenkins v. T&N PLC* (1996) 45 Cal.App.4th 1224, 1229 [citing definition of "product" in draft Restatement].)

Section 19 of the Third Restatement defines a product for purposes of strict liability as "tangible personal property distributed commercially for use or consumption," excluding human blood and tissue. (Rest.3d Torts, Products Liability, § 19, subds. (a), (c).) Comment b to this section recognizes the division among courts regarding whether living animals should be considered products for determining a commercial seller's liability in tort and states that "when a living animal is sold commercially in a diseased condition and causes harm to other property or to persons, the animal constitutes a product for purposes of this Restatement." (*Id.*, § 19, com. b.)

The definition offered in section 19 of the Third Restatement applies to all product liability claims, but we focus on the narrower question of whether an item is a product for the purpose of design defect claims. Comment b to the Third Restatement centers its discussion on diseased animals, noting that diseased animals that are themselves harmed are not eligible for recovery under the Third Restatement, while animals in a "diseased condition" that cause harm to other property or to persons are products for which damages are available under the Third Restatement. We focus on the issue of disease because it is the disease from which the claim of design defect arises; absent a designed product, there can be no design defect claim.

The dissent accuses us of failing to "address the reality" that a pet sold at a pet store is—diseased or not—" 'tangible personal property distributed commercially for use or consumption,' " thereby falling within the definition of "product" taken from section

16

19 of the Third Restatement. (Dis. opn., at pp. 5-6.) This misunderstands our point, which is that the comment recognizes nuances involved with living animals. Comment b to the Third Restatement does not expressly distinguish "healthy" living animals from ones in a "diseased condition"; however, it does make clear that an animal in a "diseased condition" *is* a defective product. Moreover, although it acknowledges the division among courts regarding how to characterize living animals, comment b to the Restatement chooses only to address animals "in a diseased condition" as products, even though some of courts have held living animals are not defective products when the "defect" derives from the animal's personality or dangerous propensity. (See, e.g., *Blaha v. Stuard* (S.D. S.Ct. 2002) 640 N.W.2d 85, 88-89 (*Blaha*) [pet dog bit child]; *Kaplan v. C Lazy U Ranch* (D.Colo. 1985) 615 F.Supp. 234, 237 (*Kaplan*) [biting and kicking horse].) The animal's "diseased condition" *is* the evidence of a defective product that brings it under Third Restatement. (See also Rest.3d Torts, *supra*, § 21, cmts. d-f [discussing harms caused by *defect* in products as establishing eligibility for recovery under Third Restatement].) We likewise concentrate on the role of "disease" in determining whether a pet rat living in its natural condition, without modification, can be a defective product.

Andrew suggests that the word "diseased" should be considered from the perspective of the human who ultimately contracts RBF. However, "diseased" is an adjective modifying the condition of the living animal. Neither party defines "diseased," but Webster's Third New International Dictionary defines it as "affected with or as if with a disease[;] lacking health or soundness[;] sickly . . . ." (Webster's 3d New Internat. Dict.

17

(2002) p. 648.)  Thus, under the Third Restatement, in assessing whether the rat here is a product, we ask whether a rat carrying streptobacillus moniliformis is in a diseased condition, i.e., affected with a disease or lacking in health or soundness.  It is not, and the parties do not disagree on this point.

Andrew's expert Dr. Vinetz explained that RBF, developed by some humans after exposure to the streptobacillus moniliformis bacteria, is a disease of humans, not of rats. He testified streptobacillus moniliformis bacteria is a nonessential bacteria not part of a rat's natural flora, but instead operating as a commensal organism that resides in the upper respiratory tract section, or the upper oropharyngeal area.[6]  As a commensal organism, the bacteria adapts to the rat and the rat adapts to it.  The bacteria does not cause a disease in the rat that makes the rat sick.  Thus, an animal carrying the bacteria also does not appear sick; it has glossy fur, bright eyes, and looks alert.  This testimony makes clear that the streptobacillus moniliformis bacteria can be disease-causing in humans, but the carrier rat is not diseased.  Thus, where an animal (i.e., the rat) coexists with an organism (streptobacillus moniliformis bacteria) and that organism causes no harm to the animal, the animal itself is not diseased and is therefore not a product.

California has adopted outlines of the Restatement Second of Torts, section 402A. (*Cronin v. J.B.E. Olson Corp.* (1972) 8 Cal.3d 121, 131.)  Section 402A provides that a

---

6     Defense expert Dr. Sean Elliott, a pediatric infectious disease specialist, testified that streptobacillus moniliformis is "normal flora," or part of a rat's normal intestinal bacteria.  We are not influenced by this apparently-contradictory testimony because even considering only Dr. Vinetz's testimony, we reach the same conclusion about how to characterize a rat carrying streptobacillus moniliformis.

party that sells a product in a defective condition is liable for the harm thereby caused to the consumer or end user of the property as long as the seller is engaged in the business of selling the product and the product is "without substantial change in the condition in which it is sold." (Rest.2d Torts, *supra*, § 402A, subd. (1)(b).) However, its text and comments are silent regarding the application of strict liability to live animals. (See Rest.2d Torts, *supra*, § 402A.)

Courts considering strict liability claims under the Second Restatement, section 402A have reached conflicting conclusions about whether diseased animals and animals with dangerous personalities are products. One line of cases follows a 1977 New York opinion, *Beyer v. Aquarium Supply Co.* (*Div. of Hartz Mountain Corp.*) (N.Y. 1977) 404 N.Y.S.2d 778 (*Beyer*), which concluded that public policy supports holding accountable a breeder, distributor, or vendor who places a diseased animal in the stream of commerce. (*Id.* at p. 779 [diseased hamster]; see also *Sease v. Taylor's Pets, Inc.* (Or. App. 1985) 700 P.2d 1054 (*Sease*) [rabid skunk][7]; *Worrell v. Sachs* (Conn. 1989) 563 A.2d 1387, 1387 (*Worrell*) [parasite-carrying puppy].)[8] In *Beyer*, the court compared a diseased hamster to a complex manufactured product and concluded the risk to human health from a

_____

[7]    In *Sease*, the court reasoned that a living creature could be a product because there was no requirement that a product be manufactured or processed, and Oregon statutes "cover[ed] products subject both to natural change and intentional alteration," providing an explicit defense when the seller can show the product is not in substantially the same condition as it was when it was sold. (*Sease*, *supra*, 700 P.2d at p. 1058.)

[8]    The *Worrell* court concluded the animal's status as a product should be considered separately from whether it had a defect and viewed a disease as a defect. (*Worrell*, *supra*, 563 A.2d at p. 1388.)

19

diseased animal is at least as great as that posed by a manufactured product.[9]  (*Beyer*, at p. 779.)  These cases largely concluded that a seller could control an animal's diseased condition up to the point of sale or to address public health concerns, but they are distinguishable from the present case because unlike the diseased animals in those cases, rats carrying streptobacillus moniliformis are not diseased.  Additionally, although streptobacillus moniliformis may pose a risk to human health, as we explain *ante*, that alone does not justify application of the design defect theory of strict liability, particularly where—as here—other available theories of liability achieve similar goals.

Another line of cases follows Illinois decisions which have held that living animals are not products because they are participants in "a constant interaction with the environment around them as part of their development" and live "in a constant process of internal development and growth."  (*Anderson v. Farmers Hybrid Cos.* (Ill. App. 1980) 408 N.E.2d 1194, 1199 (*Anderson*); see also *Blaha, supra,* 640 N.W.2d at pp. 88-89 [pet dog bit child]; *Kaplan, supra,* 615 F.Supp. at p. 237 [biting and kicking horse]; *Zendejas v. Redman* (S.D.Fla. June 13, 2017, No. 15-81229-CIV) 2017 U.S.Dist.Lexis 90503, *4, *19-*20 (*Zendejas*) [show horse that refused to jump].)  These courts have noted the animals are not "designed, assembled, fabricated . . . , produced, [or] constructed" (*Kaplan*, at p. 238); they are "living, breathing, sentient creature[s] that constantly grow[], learn[], experience[], and change[] based on both external and internal factors that often cannot be controlled by the seller . . . ."  (*Zendejas*, at p *19.)  Under

---

[9]     The *Beyer* court did not address the mutable nature of animals.  (*Beyer*, *supra*, 404 N.Y.S.2d at p. 779.)

this line of reasoning, live animals are not products for purposes of strict liability because there is no way to attribute their behavior solely to their status at the point of sale, as their behavior is influenced by the surrounding environment. At the same time, these cases recognize that the animals sold in their natural state are not "designed." (*Kaplan*, at p. 238.)

Courts have also used mutability to explain why diseased animals are not products for purposes of strict liability. For example, in *Anderson* plaintiffs purchased female breeding pigs that had a contagious and infectious disease which infected the buyers' swine herd, requiring expensive treatment and leading to the death of several members of the herd. (*Anderson*, *supra*, 408 N.E.2d at pp. 1195-1196.) The appellate court concluded that to be a product, the good's nature must be fixed at the time it leaves the manufacturer's or seller's control, and the good must reach the user without substantial change. (*Id.* at p. 1199.) The court recognized that imposing strict liability helps insure costs of injury are borne by those who market the product rather than an injured person powerless to protect himself or herself. (*Ibid.*) However, it concluded that purpose is defeated if liability is imposed on those goods whose character is "easily susceptible" to changes beyond the control of the seller. (*Ibid.*) In those situations, neither party has the power to protect against the good's changing nature; thus, it would be unfair to force the burden on the seller over the user.

Ohio and Connecticut courts have similarly held that sick birds are not products. In *Malicki v. Koci* (Ohio App. 1997) 700 N.E.2d 913 (*Malicki*), the court considered

21

whether a parakeet that transmitted psittacosis, or "parrot fever"[10] to its new owners was a product. The court held it was not, and it explained: "Imposing strict liability upon the defendants in this case would yield the harsh result of holding them responsible as absolute insurers of the health of a living organism whose health can be affected by many factors totally outside the defendant's control." (*Id.* at p. 915.) Similarly, in *Latham v. Wal-Mart Stores, Inc.* (Mo. App. 1991) 818 S.W.2d 673, a Missouri appellate court considered whether a parrot that transmitted psittacosis was a product. The court decided it was not: "It seems unreasonable for us to hold a seller liable for changes potentially wrought upon a 'product' by the purchaser, while the item was completely outside the seller's control." (*Id.* at p. 676.) The mutability in these cases addressed the influence of environmental factors on the physical health of the animals rather than their personalities or nature, but the theory remains the same: the seller cannot control outside influences or the internal biological forces that impact the health or dangerousness of the animal.

The dissent argues that none of these authorities adopts our reasoning that only diseased animals displaying symptoms of illness are a product. (Dis. opn., at p. 9.) This mischaracterizes our reasoning and our conclusion. Pet rats in their natural state, even carrying the bacteria, are neither diseased nor designed. Rats are susceptible to their

10    "Parrot fever" is caused by chlamydia psittaci. The bird in *Malicki* appeared healthy upon visual inspection, and the seller's expert veterinarian testified that bird's tissue samples showed no signs of psittacosis. (*Malicki*, *supra*, 700 N.E.2d at p. 914.) The virologist from the Animal Disease Diagnostic Lab at Ohio State University testified the bird was in a subclinical phase of psittacosis and had acted as a carrier of the disease. (*Ibid.*) Unlike streptobacillus moniliformis, which is carried by rats as a normal gastrointestinal, respiratory, and oral secretions and rarely affects the rat, chlamydia psittaci can cause symptoms in the bird.

environment because nothing prevents a rat from contracting the bacteria from other rats or the environment where the bacteria is found. To hold the seller responsible under the design defect theory would make the seller an absolute insurer of the rat's health, biological condition, and even behavior, even though those things are affected by factors beyond the scope of the seller's control. (See *Malicki*, *supra*, 700 N.E.2d at p. 915.) Additionally, even accepting that retailers and manufacturers are in the best position to bear the cost of injuries resulting from the goods they sell (see *Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 477 (*Jimenez*)), we do not foreclose equitable cost spreading or the apportionment of losses with our conclusion here that rats are not products for purposes of design defect theory. Those goals can be achieved through warning and manufacturing claims.

A principal purpose behind strict products liability is to relieve injured parties of onerous evidentiary burdens required in negligence causes of action. (*Barker*, *supra*, 20 Cal.3d at p. 431.) In design defect cases, once the plaintiff shows injury caused by a product's design, the burden shifts to a defendant to prove the product is not defective. (*Ibid.*) But this presumes there is a design to the product in the state in which it is sold, and as we have explained pet rats living in their natural state are not designed.

We also recognize that manufacturers and retailers are generally in a strategic position to promote the safety of the products they design. (*Jimenez*, *supra*, 29 Cal.4th at pp. 477-478; *Union Pac. Co. v. S. Cal. Edison Co.* (1985) 163 Cal.App.3d 700, 709.) In general, strict product liability promotes safer products by placing the responsibility on the party in the best position to prevent the harm caused by their danger or defect, thereby

23

incentivizing proper design and quality control. (Rest.3d Torts, *supra*, § 2, com. a.) However, here the offending item is a creature living in its natural state.

Finally, Andrew separately argues an animal's health is not relevant to its status as a product for purposes of strict liability. (See *Worrell*, *supra*, 563 A.2d at p. 1387 [concluding an animal's mutability is an issue of proximate causation to be considered separately from the animal's status as a product]; Harvey, *The Applicability of Strict Products Liability to Sales of Live Animals* (1982) 67 Iowa L. Rev. 803, 815 [arguing it is an analytical flaw to base product status on product mutability because they concern separate elements of strict liability] (hereafter *Harvey*).) Under this theory, a good's status as a product for purposes of strict liability is evaluated separately from the requirement that it undergoes a substantial change after the seller surrenders its control.[11] (Harvey, *supra*, 67 Iowa L. Rev. at pp. 815, 819-820.)

The difficulty with setting apart the defect from the definition of the product here is that the policy rationale underpinning strict liability for design defect relies on the good being defective to justify its application. For example, the cost allocation policy asks how to appropriately allocate the cost of injury resulting from the *defect*. (See *Barker*, *supra*, 20 Cal.3d at p. 431.) Here, we never reach the question of whether the bacteria is

---

[11] One law review article promoting this approach recommends treating live animals as products, attributing to them a presumption of mutability that results in the relevant defect, then requiring a plaintiff to prove the animal did not experience any substantial change after leaving the seller, i.e., the defect was present at the time of sale. (Harvey, *supra*, 67 Iowa L. Rev. at p. 821.) However, this approach would be problematic in the case before us, even if we were to consider the rat carrying the streptobacillus moniliformis bacteria to be diseased because there is an incubation period for animals' contraction of the bacteria; the PCR test can be negative one day and positive the next.

a defect because we have concluded it is not part of a design and does not make the rat diseased.

Still, we understand that a consumer may be unable to recognize and take additional precautions against disease-causing bacteria an animal may carry, particularly here, where 10 to 100 percent of pet rats carry the bacteria. The real risk is contracting RBF without treating it. RBF is rare; there are approximately 200 documented cases in United States history, and Petco alone sells about 400,000 rats per year. Dr. Vinetz estimated that between zero and 10 people are admitted annually to the hospital for RBF, but that it can sometimes resolve on its own, too.[12] Those risks are better addressed by negligence, negligent warning, and warning and manufacturing strict liability causes of action, all of which were available to the plaintiffs and considered by the jury here.

III

APPLICABILITY OF CONSUMER EXPECTATIONS TEST

Andrew requested that the trial court instruct the jury on two alternative tests to determine whether Aidan's pet rat suffered from a design defect—the risk-benefit test and the consumer expectations test. The court provided instructions on the risk-benefit test

---

[12] According to the Center for Disease Control, the mortality rate for untreated RBF is 7 to 13 percent. In closing arguments, Petco's counsel argued: "Five million rats, 45 alleged claims of rat-bite fever. And the likelihood of harm occurring, again, .0009 percent . . . . [¶] . . . [¶] Are there risks of rat-bite fever? Very, very, very minimal risks. Very, very, very minimal. The percentages are infinitesimal. They're tiny. [¶] . . . [¶] Did the potential risk present a substantial danger to persons using or misusing the pet? I would suggest to you that the plaintiffs have not proven there is a substantial danger that you're going to get rat-bite fever from a rat . . . ." Even if Petco sales were attributed for the entire universe of documented RBF cases, our calculations indicate the mortality rate would be less than .0065 percent.

but not the consumer expectations test. Andrew contends this was error. Petco defends the court's decision on grounds that a pet rat is inherently complex and evaluating the circumstances of the alleged failure in this case requires scientific and medical knowledge beyond the understanding of ordinary consumers.

Having concluded a pet rat carrying streptobacillus moniliformis is not a product for purposes of strict liability, design defect, there is no need to consider whether the court properly instructed the jury regarding the available tests. However, were we to draw a conclusion on this issue, we would affirm the court's approach.

A.    *Consumer Expectations Test:  General Principles*

We review the propriety of jury instructions de novo. (*Cristler v. Express Messenger Systems, Inc.* (2009) 171 Cal.App.4th 72, 82.) A plaintiff may prove the existence of a design defect under either of two alternative tests, the consumer expectations test (if applicable) or the risk-benefit test.[13] (*Barker*, *supra*, 20 Cal.3d at p. 432.) Under the consumer expectations test, the plaintiff may prove a design defect by showing that the product failed to perform as safely as an ordinary consumer would expect when used in an intended or reasonably foreseeable manner. (*Ibid*.) "The rationale of the consumer expectations test is that '[t]he purposes, behaviors, and dangers of certain products are commonly understood by those who ordinarily use them.' [Citation.] Therefore, in some cases, ordinary knowledge of the product's characteristics

---

13    The Third Restatement rejects the consumer expectations test in favor of the risk-benefit test and whether there was a better alternative design available. (*Webb v. Special Electric Co., Inc.* (2016) 63 Cal.4th 167, 184, fn. 8, citing Rest.3d Torts, *supra*, § 2, com. g.)

26

may permit an inference that the product did not perform as safely as it should." (*Saller v. Crown Cork & Seal Co., Inc.* (2010) 187 Cal.App.4th 1220, 1232 (*Saller*).) The consumer expectations test considers minimum safety expectations of the product's users, not the expectations of the general consuming public. (*Demara v. The Raymond Corp.* (2017) 13 Cal.App.5th 545, 559.)

Alternatively, under the risk-benefit test, plaintiffs can prove a design defect if they show the product's design proximately caused an injury and the defendant fails to show the design's benefits outweigh the risk of danger inherent in the design. (*Barker*, *supra*, 20 Cal.3d at p. 432.) When weighing the benefits and risks, a jury may consider a nonexhaustive list of factors, including the gravity of the potential harm resulting from the use of the product, the likelihood the harm would occur, the feasibility of an alternative safer design at the time of manufacture, and the financial cost and disadvantages of an alternative design. (*Kim*, *supra*, 6 Cal.5th at p. 30.)

"The tests are not mutually exclusive, and a plaintiff may proceed under either or both." (*McCabe v. American Honda Motor Co.* (2002) 100 Cal.App.4th 1111, 1126 (*McCabe*).) However, the consumer expectations test is reserved for cases in which "the *everyday experience* of the product's user permits a conclusion that the product's design violated *minimum* safety assumptions," regardless of the merits of the design. (*Soule*, *supra*, 8 Cal.4th at p. 567.) The inherent complexity of a product is not controlling on whether the consumer expectations test applies (*Saller*, *supra*, 187 Cal.App.4th at p. 1232), but a complex product can "cause injury in a way that does not engage its ordinary consumers' reasonable minimum assumptions about safe performance." (*Soule*,

27

at pp. 566-567.)  In such cases, the consumer expectations test does not apply.  (*Id.* at

p. 568; see also *Morson v. Superior Court* (2001) 90 Cal.App.4th 775, 793-795

(*Morson*).)

B.    *Inapplicability of Consumer Expectations Test*

Petco contends the evidence adduced at trial was insufficient to warrant a jury

instruction on the consumer expectations test because the alleged failure of the product at

issue was "esoteric and inherently complex," and it could be properly understood only

with knowledge of "the biological mechanisms of pathogens, infectious diseases, and

technicalities of rat breeding for commercial and laboratory purposes."  The trial court

accepted this argument, finding that RBF and the circumstances of the pet rat's alleged

failure were "too much" for an ordinary consumer to understand.

We assume for purposes of discussion that the biology of rats and the pathology of

RBF are complex topics.  We recognize that the consumer expectations test can apply to

complex products, depending on the circumstances of their alleged failure.  (*Saller*,

*supra*, 187 Cal.App.4th at p. 1232.)  But when the ultimate issue of design defect calls for

a "careful assessment of feasibility, practicality, risk, and benefit, the case should not be

resolved simply on the basis of ordinary consumer expectations."  (*Soule*, *supra*, 8

Cal.4th at p. 562.)  "The critical question is whether the '*circumstances of the product's*

*failure* permit an inference that the product's design performed below the legitimate,

commonly accepted minimum safety assumptions of its ordinary consumers.' "  (*McCabe*,

*supra*, 100 Cal.App.4th at p. 1122, quoting *Soule*, at pp. 568-569.)  However, "[s]ome

products cause injury in a way that does not engage its ordinary consumers' reasonable

minimum assumptions about safe performance." (*Id.* at p. 1122.)  For example, when a consumer has no idea how safe a product should be made against all foreseeable hazards, that is, in those cases where the plaintiff's theory of defect seeks to examine obscure behavior that falls outside the ordinary experience of the consumer, the consumer expectation test is inapplicable, and the defect can only be proved by the risk-benefit analysis.  (*Ibid.*)

Because the design defect is the existence of the bacteria causing RBF, central to the question here is whether the bacteria causing RBF can be designed out of rats, and a consumer's ordinary experiences do not introduce it to the potential complexities of designing a rat to be free from streptobacillus moniliformis, a bacteria which is not readily visible in the pet rat.

Andrew's infectious disease expert Dr. Vinetz told the court RBF could not be bred out of the rats because it was not a genetic condition.  As an alternative, he testified it would be "simple" to design a rat free from the bacteria that causes RBF, and he described the process:  The breeder would conduct a PCR to test the rats before their breeding, only allow rats that tested negative for the bacteria to breed, deliver the pups by cesarean section, then use rats that had tested negative to feed the new pups in a clean facility.  Dr. Vinetz testified there could be a zero percent incident rate of RBF in a "highly controlled setting."  He pointed to a research lab which provided data indicating that over an 18-month period, it had not detected streptobacillus moniliformis in the rats housed there.  That lab bred and housed rats in its research facility; those rats never left the facility and lived in other environments.

29

Defendants offered testimony regarding their unsuccessful attempts to "design" rats without streptobacillus moniliformis through the breeding process, by purchasing rats with documentation that they were negative for the bacteria, placing them in a separate, clean facility, and breeding them. These efforts resulted in some offspring that tested positive for streptobacillus moniliformis. Defendants also offered testimony that lab rats were not always healthy and did not always fare well in the pet store environment.

Although the parties disagreed about the viability of designing rats without streptobacillus moniliformis, both parties agreed that PCR testing could be used to assess whether a rat carried the bacteria with 99 percent sensitivity, but the only way to be certain a rat was free from streptobacillus moniliformis was through testing of tissue samples after euthanizing the animal.[14] Additionally, Dr. Vinetz testified that healthy domesticated or lab rats demonstrate streptobacillus moniliformis 10 to 100 percent of the time.

We draw two conclusions from this evidence. First, there is no way to be certain that any given, living rat is free from the bacteria that causes RBF. Second, it is unclear

_____

[14]    Alex, the rat, was euthanized before it was tested for streptobacillus moniliformis, and the record indicates that the initial swab was negative for the bacteria. Dr. Vinetz testified that Alex's swab was taken from the nasopharynx instead of the oropharynx, and he suggested the reason it came back negative was that the swab reflected the nasal turbinates, when the bacteria is transmitted through "spit," not "snot." Subsequent tissue testing found the bacteria in the rat's tongue, adrenal gland, several lymph nodes, and the sciatic nerve. However, the salivary gland, soft palate, and trachea, and gastrointestinal system were negative for streptobacillus moniliformis. Dr. Vinetz believed an oral swab would have been positive if it had been performed.
       One other witness testified the rat presumed to have caused him RBF tested negative for RBF.

30

whether it is within Petco's or any supplier's control to design a rat free from streptobacillus moniliformis. Because there is competing evidence about the designability of a rat free from the bacteria, this is more properly a question for the jury. However, even if the jury accepts Dr. Vinetz's testimony, this merely demonstrates there may be a better, alternative design than the one in which rats naturally exist. This type of alternative design is one for a jury to consider when weighing a product's benefits against its risks to determine whether there is a design defect at all. (See *Barker*, *supra*, 20 Cal.3d at pp. 431-432.)

Ultimately, we would conclude that ordinary experience and understanding absent a warning would not inform a consumer regarding how safely a rat should perform under any particular set of circumstances because rats contract streptobacillus moniliformis without notice or symptom. As a practical matter, here it is "impossible to eliminate the balancing or weighing of competing considerations in determining whether a product is defectively designed or not. . . ." (*Barker*, *supra*, 20 Cal.3d at p. 433.)

Additionally, as we explain *post*, "the issue of design defect cannot be resolved by standardless reference to the 'expectations' of an 'ordinary consumer' " (*Soule*, *supra*, 8 Cal.4th at p. 567, citing *Barker*, *supra*, 20 Cal.3d at pp. 433-434) because the warning here regarding the potential occurrence of RBF contributes to the " 'legitimate, commonly accepted minimum safety assumptions' of . . . ordinary consumers." (*Morson*, 90 Cal.App.4th at p. 792, quoting *Soule*, at p. 569.)

31

C.    *Plaintiff Suffered No Prejudice*

Petco maintains that even if instructions on the consumer expectations test should have been given, the failure to do so was not prejudicial in light of the jury's conclusions that it was not liable on either a negligence or strict liability failure-to-warn theory. We would be inclined to agree.

1.    *Additional Facts*

The jury was instructed on two failure-to-warn theories, strict liability and negligence. With respect to the strict liability failure-to-warn claim, the jury answered "yes" to the first question: "Did the pet rat have potential risks that were known or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community at the time of the sale?" It answered "no" to the next question: "Did the potential risks present a substantial danger to persons using or misusing the pet rat in an intended or reasonably foreseeable way?" With respect to strict liability, the jury never reached the questions of whether an ordinary consumer would have recognized potential risks and whether Petco failed to adequately warn or instruct of potential risks.

With respect to negligent failure to warn, the jury answered "yes" to the first question: "Did Petco Animal Supplies Inc. know or should it reasonably have known that the pet rat was dangerous or was likely to be dangerous when used or misused in a reasonably foreseeable manner?" It answered "yes" to the second question: "Did Petco Animal Supplies know or should it reasonably have known that users would not realize the danger?" But it answered "no" to the third question: "Did Petco Animal Supplies Inc. fail to adequately warn of the danger or instruct on the safe use of the pet rat?"

32

## 2.    *Instructional Error:  General Principles*

The failure to give a requested instruction in a civil suit will not result in a reversal unless the error was prejudicial, and the appealing party must show a "reasonable probability" that the error affected the result.  (See *Soule*, *supra*, 8 Cal.4th at pp. 580-582; *People v. Watson* (1956) 46 Cal.2d 818, 836.)  In this context, "probability" means "a *reasonable chance*, more than an *abstract possibility*."  (*Kinsman v. Unocal Corp.* (2005) 37 Cal.4th 659, 682; *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715.) In assessing an instructional error's prejudicial impact, we consider the " 'natural and probable effect on a party's ability to place his full case before the jury,' " and the likelihood of actual prejudice, considering the state of the evidence, effect of other instructions, effect of counsel's arguments, and any indications by that it was misled. (*Veronese v. Lucasfilm Ltd.* (2012) 212 Cal.App.4th 1, 31; see *Soule*, at pp. 580-581.)

## 3.    *Harmless Error*

The parties agree that all evidence related to the consumer expectation test was presented to the jury.  Andrew presented testimony from multiple witnesses about their expectations when purchasing pet rats from Petco, including testimony from Aidan's grandmother, who purchased Alex.  Plaintiff's counsel asked jurors to consider this testimony in evaluating a consumer's expectations in the context of the failure-to-warn claim.

The dispute turns on whether it is reasonably probable, in light of the jury's verdicts on the other causes of action, that the jury would have returned a verdict for Andrew under the consumer expectations test.  Taking into consideration the state of the

33

evidence, the effect of other instructions, the effect of counsel's arguments, and the special verdicts, were we considering prejudicial effect of the exclusion of the consumer expectations test jury instruction, we would conclude its exclusion was harmless. The jury returned verdicts in Petco's favor on both the strict liability failure-to-warn and the negligent failure-to-warn causes of action. Andrew contends he suffered prejudice because the consumer expectations test is a distinct cause of action, unaffected by other claims and their corresponding instructions. While we recognize these other causes of action are distinguishable from the consumer expectations test, their interplay with the ordinary consumer's expectation informs our conclusion.

The jury received instructions for the negligent and strict liability failure-to-warn causes of action, as well as for the risk-benefit design defect claim. In general, a retailer is strictly liable for failure to warn if the warning was feasible and its absence caused the injury; reasonableness of the failure to warn is immaterial. (*Webb v. Special Electric Co.*, *Inc.* (2016) 63 Cal.4th 167, 180.) A negligent failure to warn cause of action differs because the plaintiff must prove the defendant's conduct fell below the standard of care; thus, if a seller could reasonably decline to offer the warning, the failure to do so is not negligent. (*Id.* at p. 181.)

In reaching the strict liability failure-to-warn verdict, the jury concluded the pet rat had potential risks known and accepted in the scientific community at the time of the sale, but those risks did not present a substantial danger to persons using the rat in an intended or reasonably foreseeable way. The jury did not reach the question of whether an ordinary consumer would have recognized potential risks or whether Petco failed to

34

adequately warn or instruct regarding those risks because it concluded they did not pose a substantial danger.

In reaching the negligence verdict, however, the jury did answer those questions. It concluded that Petco knew a pet rat was likely to be dangerous, and that it should have known its users would not realize the danger. In so holding, the jury implicitly recognized that absent a warning, the ordinary consumer would not recognize the potential danger wrought by a pet rat. However, the jury nonetheless concluded that Petco did not fail to adequately warn consumers about the danger. In other words, taking these verdicts together, the jury concluded pet rats posed a danger that the ordinary consumer would not realize, but the danger was not substantial, and Petco supplied an adequate warning to alert consumers to the danger. Given this conclusion, it is not probable that the addition of the consumer expectations instruction would have resulted in a different outcome; to hold otherwise would be to conclude it is probable the jury would have rendered an inconsistent verdict.

Andrew explains negligent and strict liability failure-to-warn causes of action are separate and distinct claims that do not collapse into each other merely because a plaintiff alleges both. He then argues that just as negligent and strict liability causes of action are different, so too are failure-to-warn and design defect causes of action. And further, the conclusion regarding one cause of action cannot predict the jury's conclusion regarding the other. In essence, Andrew argues that one cannot speculate as to whether adequate warnings help frame a consumer's expectations.

35

Andrew cites to *Saller* to support this argument.  There, the plaintiff filed design defect and negligent and strict liability failure-to-warn claims against the manufacturer of insulation containing asbestos.  The trial court instructed the jury on the risk-benefit test and a negligent failure-to-warn theory but refused the instructions for the consumer expectations test and strict liability failure-to-warn.  (*Saller*, *supra*, 187 Cal.App.4th at p. 1230.)  The jury returned defense verdicts for the claims on which it was instructed.  (*Id.* at pp. 1230-1231.)  On appeal, the plaintiff argued the court should have instructed on the consumer expectations test and strict liability failure-to-warn claim.  (*Id.* at p. 1231.)  In response, the manufacturer asserted that the plaintiff did not present evidence of what an ordinary consumer would expect, and any alleged error was harmless due to the defense verdicts on the risk-benefit design defect and negligent failure-to-warn claims.  (*Ibid.*)  The Court of Appeal rejected these arguments and reversed.  (*Id.* at pp. 1236, 1239.)

*Saller* is distinguishable because it answered a different question than the one before us now.  The court did not consider whether a jury's conclusion about the adequacy of a warning would impact the verdict on a consumer expectations test in light of the given warning; no warning was offered to consumers in *Saller* at all.  (*Saller*, *supra*, 187 Cal.App.4th at p. 1240.)  The court concluded that the findings on negligent failure-to-warn did not preclude a different outcome under the strict liability failure-to-warn cause of action.  (*Ibid.*)

36

Moreover, the issue here is not whether warning and design defect causes of action are distinct theories;[15] it is whether the inconsistent outcome that plaintiffs propose makes it less than reasonably probable the outcome here would be different taking into consideration the existence and adequacy of the warning that contributes to a consumer's expectations. The parties agree that if verdicts that simultaneously conclude consumers were adequately warned of known risks and that consumers would reasonably expect the product to perform more safely than the warnings indicate are contradictory, they would be fatally contradictory.[16]

Andrew maintains that were the instruction offered, the jury would probably have found in his favor because the consumer expectations test does not consider the complexity of the product, the magnitude of the danger, the feasibility of a warning, or the reasonability of the seller. It merely considers the failure of the product without other considerations. But this argument ignores the influence of the warning on a consumer's

---

[15] Failure-to-warn and designed defect based on the consumer expectations test are distinct causes of action, and plaintiffs may allege both. (*Arnold v. Dow Chemical Co.* (2001) 91 Cal.App.4th 698, 717; *Soule*, *supra*, 8 Cal.4th at p. 567.)

[16] Andrew explains that such an inconsistent verdict is reversible error, necessitating a new trial. (See, e.g., *City of San Diego v. D.R. Horton San Diego Holding Co.*, *Inc.* (2005) 126 Cal.App.4th 668, 682 [inconsistent verdict rule requires a jury to resolve all controverted issues].)

expectation.[17]  (See, e.g., *Hansen v. Sunnyside Products, Inc.* (1997) 55 Cal.App.4th 1497, 1501 [recognizing the relevance of warnings under the risk/benefit test]; see also Rest.3d Torts, *supra*, § 2, com. g [explaining a consumer's expectations are influenced by how products are portrayed and marketed].)

Andrew nonetheless contends that customers expect the rats to be healthy and points to testimony by consumers and Petco employees about those expectations.  This testimony alone does not lead to the conclusion that it is reasonably probable the jury would have reached a different verdict under the consumer expectations test.  There was also testimony indicating consumers had no expectations about rat biology or that they weighed risks because they had general knowledge about the potential for disease but purchased pet rats anyway.[18]

The dissent also points to testimony of consumer expectations about the safety or health of pet rats based on factors such as Petco's slogan and pet-related custom and

---

[17]    Although no published California cases have expressly held that warning information helps form the basis of the ordinary consumer's expectations, other jurisdictions have drawn that conclusion.  (*Ford Motor Co. v. Trejo* (Nev. 2017) 402 P.3d 649, 656; *Knitz v. Minster Mach. Co.* (Ohio Ct.App. 1987) 1987 Ohio App. Lexis 5828, at *125; *Hoffman v. Hercules Chem. Co.* (N.D.Ill. 2004) 2004 U.S. Dist. Lexis 22505, at *24).)  Where there are federal, statutorily-mandated warnings, such warnings have precluded liability under the consumer expectations test because the ordinary consumer's expectation has been preempted by the statutory warning.  (See *Papike v. Tambrands Inc.* (9th Cir. 1997) 107 F.3d 737, 743 [explaining consumer not entitled to expect product to perform more safely than government-mandated warnings and concluding warnings met federal requirements, so design defect claim failed consumer expectations tests].)  However, we are not suggesting that a product labeled with an adequate warning will automatically fail the consumer expectations test under California tort law, only that the warning will inform a consumer's expectations.

[18]    One witness testified that he returned to Petco to get a replacement rat after the first rat he purchased bit his son, causing RBF.

social practices as evidence that a jury may have returned a different verdict under the consumer expectations test than it did on the risk-benefit test. (Dis. opn., at p. 15.) This evidence points to consumer expectations without consideration of the risks arising out of complex rat biology and the potential interaction with human beings. The dissent's recognition that the risk of serious injury or death from a pet rat may not be consistent with the expectations of ordinary consumers even in light of a warning that tells consumers there is such a risk (dis. opn., at p. 17) further bolsters our conclusion that use of standardless consumer expectations test in this case could lead a jury to completely ignore known risks, contradicting its conclusion that Petco offered an adequate warning. If jurors applying the consumer expectations test were to consider all the factors, as the dissent explains they must, jurors could not simply ignore the warning, which informed consumers that they could contract RBF from handling the pet rat. Here Andrew does not challenge any of the jury's verdicts—not the conclusion that Petco did not act negligently in selling the rat, nor the verdicts that Petco did not fail to adequately warn consumers of the risk of RBF. Given consumers' knowledge of that risk, it is less than reasonably probable the outcome here would be different under the consumer expectations test.

Finally, Andrew argues that the jury's unanimous finding that consumers would not realize the dangers inherent in Petco's product means it is reasonably probable that the jury would have returned a verdict in Andrew's favor under a consumer expectations theory. Courts consider the closeness of a verdict as a factor indicating prejudice. (*Griesel v. Dart Industries*, *Inc.* (1979) 23 Cal.3d 578, 584-585; *Norman v. Life Care*

39

*Centers of America* (2003) 107 Cal.App.4th 1233, 1252-1253.) But here the verdict related to the adequacy of the warning was split at 10-2, not 9-3. The verdict that was split at 9-3 concluded the benefits of the rat's design outweighed its risks. But that does not offer any meaningful interpretation of what the ordinary consumer's expectation was, only that the balancing of risks and benefits was a close call. Moreover, this conclusion is undercut by the jury's other findings, which, as we have explained, necessarily impact what the ordinary consumer in these situations expects.

We are sympathetic to Andrew and his family for the tragic loss of Aidan. However, because we conclude an unmodified rat is not a designed product for purposes of design defect strict products liability, we are compelled to affirm the judgment.

DISPOSITION

The judgment is affirmed. Parties to bear their own costs on appeal.


HUFFMAN, Acting P. J.

I CONCUR:


HALLER, J.

40

Dato, J., dissenting.

The beginning of this story is familiar to many parents and grandparents throughout California; the end is not.  A child wants a pet, and the parent or grandparent sees it as an opportunity to provide companionship and teach the child responsibility.  Yet the story in this case took a tragic turn when the pet rat purchased by Aidan Pankey's grandmother from national retailer Petco Animal Supplies, Inc. carried bacteria that was transmitted to 10-year-old Aidan and caused his death.  Aidan's family is left to wonder how this could have happened.

This lawsuit by Aidan's father claims that Aidan's rat was a defective product placed in the stream of commerce by Petco.  To recover damages on a strict products liability theory, a plaintiff must first show that injury or death was caused by a "product." He or she must then demonstrate that the product was defective.

Addressing an issue of first impression under California law, the majority opinion purports to answer the first question by conflating it with the second:  it holds that a live animal is not a "product" because the rat in this case wasn't really "diseased."  But "[a] 'product' is broadly defined to include any 'tangible personal property distributed commercially for use or consumption.' " (*Johnson v. United States Steel Corp.* (2015) 240 Cal.App.4th 22, 31 (*Johnson*), quoting Rest.3d Torts, Products Liability, § 19, subd. (a).)  A mass-marketed pet rat—Petco sells 400,000 every year—plainly satisfies this expansive definition.  Whether Aidan's rat was "diseased" is relevant to neither the rat's status as a product, nor the question of whether it was defective.  A product is

defective if it creates an unacceptable risk of harm *to human beings*. That the rat did not

look or feel sick has no bearing on this analysis.

The more difficult question in this case is the second one—whether the rat

carrying streptobacillus moniliformis was defective, and that would generally be an issue

for the jury to decide. The problem here is that the trial court refused to instruct the jury

on one of the two available tests to show a design defect—the consumer expectations

test—concluding it would be "too much" to expect ordinary consumers to have safety

assumptions about pet rats. To the contrary, however, ordinary retail pet store customers

can form reasonable safety expectations about their purchases, including that a pet rat

will not kill their child. I believe the trial court misapplied established California law in

reaching its conclusion, and that the majority opinion errs in approving that decision.

Accordingly, I respectfully dissent.

A.      *A Pet Rat as a Product*

Petco argued in the trial court that a live animal cannot be a "product" for purposes

of strict products liability, and it reprises that argument here. The trial court rejected

Petco's contention, relying in part on the broad definition of "product" found in section 19

of the Restatement Third of Torts, Products Liability (hereafter Restatement), and cited

approvingly by California courts. (See, e.g., *Johnson*, *supra*, 240 Cal.App.4th at p. 31.)

The majority opinion agrees with Petco, disagrees with the trial court, and holds as a

matter of first impression under California law that an "unaltered" or "unmodified" pet rat

is not a product for purposes of asserting a design defect theory. (Maj. opn., at pp. 2, 41.)

2

The area of law known as "products liability" refers to a set of legal principles and doctrines that impose liability on economic entities that produce, distribute and sell defective products which cause damage or injury. (See *Merrill v. Navegar*, *Inc.* (2001) 26 Cal.4th 465, 478.) Strict liability is imposed for defective products, and has been applied to three different categories or types of defects—manufacturing defects, design defects, and warning defects. (*Anderson v. Owens-Corning Fiberglas Corp.* (1991) 53 Cal.3d 987, 995.) But regardless which type of defect the plaintiff alleges, he or she must first establish, as a threshold matter, "that the object or instrumentality claimed to be defective was in fact a 'product.' " (*Brooks v. Eugene Burger Management Corp.* (1985) 215 Cal.App.3d 1611, 1626 (*Brooks*).) This inquiry depends, in large part, on the policies underlying the strict products liability doctrine. (*Fluor Corp. v. Jeppesen & Co.* (1985) 170 Cal.App.3d 468, 475; *Pierce v. Pacific Gas & Elec. Co.* (1985) 166 Cal.App.3d 68, 83 (*Pierce*).)

As Justice Traynor explained in his seminal opinion for the California Supreme Court in *Greenman v. Yuba Power Products*, *Inc.* (1963) 59 Cal.2d 57, a principal purpose of strict products liability is "to insure that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market rather than by the injured persons who are powerless to protect themselves." (*Id.* at p. 63.) The doctrine eases the plaintiff's burden where negligence is present but difficult to prove, incentivizes improved product safety, induces allocation of resources towards safer products, and spreads the risk of loss among all product users. (*Pierce*, *supra*,

3

166 Cal.App.3d at p. 83.) Each of these policies supports the determination that the pet rat sold by Petco in this case was a product.

Most notably, recognizing a pet rat as a product appropriately allocates the cost of a defective animal to the breeders, suppliers, and retailers who placed the animal on the market and are in the unique position to detect and prevent the spread of streptobacillus moniliformis before sale to the public. This policy is especially significant for pet animals because consumers are in many instances unable to recognize—much less take precautions against—harmful conditions in the animals they purchase. Significantly here, witnesses from both sides agreed a consumer cannot determine whether a pet rat carries streptobacillus moniliformis based on its physical appearance.[1] Considering the inconspicuous nature of these kinds of alleged animal defects, public policy strongly supports imposing strict liability on animal breeders, suppliers, and retailers for injuries proximately caused by the defective animals they place on the market. Moreover, treating a pet rat as a product would incentivize Petco and other members of the distribution chain to reduce the risk that rats with streptobacillus moniliformis will reach the consuming public. (*Union Pac. Ins. Co. v. S. Cal. Edison Co.* (1985) 163 Cal.App.3d 700, 709 ["The manufacturer is held strictly liable because it is in a peculiarly strategic position to promote the safety of its products."].)

---

[1]    Plaintiff's expert testified that rats carrying streptobacillus moniliformis have no "externally visible signs of illness" and "don't look sick." Likewise, Petco's vice president of veterinary medicine agreed that the bacteria represents a "hidden danger" and testified that streptobacillus moniliformis cannot be detected by visual inspection.

4

Further, strict products liability ensures that costs attributable to defective animals, like other defective goods, can be equitably apportioned among members of the distribution chain and internalized in the price of the product. (*Jimenez v. Superior Court* (2002) 29 Cal.4th 473, 485 (*Jimenez*) [strict liability "promote[s] equitable spreading and apportionment of the losses resulting from physical injuries as a cost of doing business"].) As the tragic circumstances of this case make clear, a defective pet rat can present a substantial threat to the health and safety of consumers and cause irreplaceable loss. A recognition that pet animals sold by retail merchants are products would ensure, at a minimum, that the economic value of these losses would be equitably apportioned among retailers, suppliers, and other members of the vertical distribution chain, who could in turn spread those costs to all of their animal-purchasing customers. A contrary conclusion would force these sometimes-catastrophic losses upon the handful of customers unlucky enough to have received a bacteria-carrying animal.

The majority opinion does not dispute that these policy considerations support a conclusion that a commercially distributed pet animal is a product for purposes of strict products liability. (Maj. opn., at pp. 23–25.) Nor does it address the reality that a pet animal sold at a retail establishment is "tangible personal property distributed commercially for use or consumption," and therefore surely satisfies the Restatement

definition of a product.[2] (Rest.3d Torts, *supra*, § 19, subd. (a).) Instead, it focuses entirely on the statement in comment b to section 19 that "when a living animal is sold commercially in a diseased condition and causes harm to other property or to persons, the animal constitutes a product for purposes of this Restatement." (Maj. opn., at p. 16, quoting Rest.3d Torts, *supra*, § 19, com. b.) Without additional analysis, the majority opinion assumes that a "diseased condition" is a necessary requirement for treating a live animal as a "product," and ultimately concludes that Aidan's pet rat was not "diseased" because streptobacillus moniliformis did not "make[] the rat sick." (Maj. opn., at p. 18.) Accordingly, a rat carrying the streptobacillus moniliformis bacteria "is not diseased and is therefore not a product." (Maj. opn., at p. 18.)

But the Restatement comment is intended to be illustrative, not definitional. This is clear when the reference to "diseased condition" is read in context:

> Courts are divided regarding whether living animals, such as pets or livestock, should be considered to be products for the purpose of determining a commercial seller's liability in tort. Frequently, as when diseased livestock are sold and subsequently must be destroyed, the claim to recover for their value involves a claim for harm to the product itself and thus represents a claim for pure economic loss not permitted by this Restatement. See [Restatement Third of Torts, Products Liability,] § 21. But when a living animal is sold commercially in a diseased condition and causes harm to other property or to persons, the animal constitutes a product for purposes of this Restatement. (Rest.3d Torts, *supra*, § 19, com. b.)

---

[2]    As one commentator has correctly summarized, "pets comfortably fit within any definition of the term ['product']." (Parent, *Every Dog Can Have Its Day: Extending Liability Beyond the Seller by Defining Pets As "Products" Under Products Liability Theory* (2006) 12 Animal L. 241, 243.)

The first sentence indicates that the purpose of the comment is to address a conflict in the case law as to whether live animals, such as pets and livestock, are products for purposes of tort liability.  (Rest.3d Torts, *supra*, § 19, com. b.)  The Restatement answers that question directly—yes, they are because they are "tangible personal property distributed commercially for use or consumption."[3]  (Rest.3d Torts, *supra*, § 19, subd. (a).)

As an *example*, comment b mentions "diseased" livestock without defining the term.  If diseased livestock is sold—presumably for human consumption—and then has to be destroyed because it can't be used for its intended purpose, the economic loss to the buyer is not compensable *in tort* because it is harm to the *product* itself.  (See *Jimenez*, *supra*, 29 Cal.4th at p. 482 [discussing the economic loss doctrine].)  But the comment goes on to explain that if the defect in the product "causes harm to other property or to persons," it *is* the proper subject of a product liability action.  The critical question is whether the product creates a risk of harm to persons or other property.  (See Lanetti, *Toward a Revised Definition of Product under the Restatement* (*Third*) *of Torts: Products Liability* (2000) 35 Tort & Ins. L.J. 845, 873 ["The risk presented to the consumer when purchasing the diseased animal is as great as, and arguably greater than, when purchasing a traditional defective product."  (Italics added.)].)  It makes no difference whether the animal (i.e., the product itself) is symptomatic.

---

[3]  "[P]ets are considered property of their owners."  (*Kimes v. Grossner* (2011) 195 Cal.App.4th 1556, 1559; see Civ. Code, § 655.)  Further, the parties agree that a consumer "uses" a pet for companionship.  (*People v. Chung* (2010) 195 Cal.App.4th 721, 728, fn. 4 [discussing the companionship function of pets].)

7

As the Restatement commentary reflects, there is limited case law from other jurisdictions that reaches a contrary conclusion—that live animals are not products for purposes of strict products liability. These cases rely on "mutability" concerns, suggesting that the purposes of strict products liability "would be defeated" if liability were imposed for products with a "changeable nature" subject to "events and conditions outside the control of the seller." (E.g., *Anderson v. Farmers Hybrid Cos.*, *Inc.* (Ill. App. 1980) 408 N.E.2d 1194, 1199; *Latham v. Wal-Mart Stores*, *Inc.* (Mo. App. 1991) 818 S.W.2d 673, 676 ["We tend to agree with the Illinois view, that due to their mutability and their tendency to be affected by the purchaser, animals should not be products"]; *Malicki v. Koci* (Ohio App. 1997) 700 N.E.2d 913, 915 [parrot is not a product because its "health can be affected by many factors totally outside the defendant's control"].)

The reasoning of these cases is both unpersuasive and inconsistent with broader principles of California law.[4] Mutability may affect whether a defendant is ultimately

---

[4]     Better reasoned case law and scholarly commentary concludes that live animals can be products. For example, in *Beyer v. Aquarium Supply Co.* (*Div. of Hartz Mountain Corp.*) (N.Y. 1977) 404 N.Y.S.2d 778 (*Beyer*), a New York court followed the California approach of analyzing the policies underlying strict products liability. It concluded "there is no reason why a breeder, distributor or vendor who places a diseased animal in the stream of commerce should be less accountable for his actions than one who markets a defective manufactured product." (*Beyer*, *supra*, 404 N.Y.S.2d at p. 779; see also Lannetti, *supra*, 35 Tort & Ins. L.J. at pp. 864, 873 [strict liability for sellers of diseased animals "allows an equitable distribution of losses and promotes the marketing of safe products"].) Agreeing with *Beyer*, the Oregon Court of Appeals and a Connecticut trial court specifically rejected the argument that the fixed or unfixed nature of property defines whether it is a product. (*Worrell v. Sachs* (Conn. 1989) 563 A.2d 1387, 1388; *Sease v. Taylor's Pets*, *Inc.* (Or. App. 1985) 700 P.2d 1054, 1058.) As the Connecticut court explained, mutability is "highly significant on the issue of *liability*" in a given case because liability depends, in part, on whether a product reaches its consumer without

liable for injuries caused by a product.  For instance, a substantial and unforeseeable

change to an item may make it difficult or impossible for a plaintiff to prove a defect or

causation.  (*Jimenez*, *supra*, 29 Cal.4th at p. 480 ["What matters is whether the [products]

were defective when they left the factory, and whether these defects caused the alleged

injuries."]; see also *Vermeulen v. Superior Court* (1988) 204 Cal.App.3d 1192, 1202

[a change to the quality or character of something after it leaves a defendant's control

may constitute an intervening and superseding cause that precludes liability].)  But

mutability is not relevant to the foundational question whether property is a product.

(See *Pierce v. Pacific Gas & Elec. Co.*, *supra*, 166 Cal.App.3d at p. 83 [differentiating

between the predicate issue of product status and the issue of liability]; Harvey, *The

Applicability of Strict Products Liability to Sales of Live Animals* (1982) 67 Iowa L.Rev.

803, 817 [although a change to a product after its leaves defendant's control is relevant to

liability, it is "analytically flawed" to base product status on product mutability].)  More

importantly, perhaps, none of the out-of-state authorities cited by Petco adopt the

reasoning of the majority opinion here—that only diseased animals displaying symptoms

of an illness are products.

Implicitly acknowledging the novelty of its doctrinal rationale, the majority justify

the approach based on the "difficulty with setting apart the defect from the definition of

---

substantial change.  (*Worrell*, *supra*, 563 A.2d at p. 1387, italics added.)  However, "it
does not necessarily follow logically that inability to prove a case because of mutability
means that an animal is not a *product* at all."  (*Ibid.*, italics added; *Sease*, *supra*, 700 P.2d
at p. 1058 [Oregon strict products liability doctrine "cover[s] products that are subject to
both natural change and intentional alteration"].)  In other words, the mutability concern
"confuses proof of liability with [product] status."  (*Worrell*, *supra*, 563 A.2d at p. 1387;
*Sease*, *supra*, 700 P.2d at p. 1058.)

the product" because "strict liability for design defect relies on the good being defective to justify its application." (Maj. opn., at p. 25.) But the policy justification for strict liability always relies on the product being "defective" in some way. This is true regardless of whether the theory of defect is based on the product's design, its production, or the failure to provide adequate warnings. The presence of a defect is always a second and distinct step of the analysis. The majority's reasoning is circular because whether a live animal is a product depends on whether it has a defect, so that only defective live animals are products. And if an animal is "diseased" so that it *is* a product, when would it not also be defective? Two distinct analytic questions are collapsed into one.

The majority opinion's intermittent focus on whether Petco's rats are products *for purposes of a design defect theory* raises additional concerns about how the holding will be applied, and ultimately renders the proffered rationale unworkable. Consistent with both the Restatement discussion[5] and precedent, the parties briefed the central question whether a rat or a live animal is a product "for the purposes of strict products liability." And the majority opinion often uses similar phraseology. (Maj. opn., at pp. 2, 12, 15, 21.) Indeed, this is consistent with the majority's recognition that it is necessary to determine whether something is a "product" regardless of what type of defect the plaintiff is alleging. (Maj. opn., at pp. 14–15, citing *Brooks*, *supra*, 215 Cal.App.3d at p. 1626.)

---

5      Section 19 appears in Restatement Chapter 4, "Provisions of General Applicability," under Topic 3, "Definitions." Comment a to section 19 explains that the question is "whether something distributed in commerce is a product *for purposes of tort liability.*" (Rest.3d Torts, *supra*, § 19, com. a, italics added.)

10

Yet on other occasions, especially when stating its conclusion, the majority opinion appears to limit its holding to what is a product "*for purposes of design defect theory*" (maj. opn., at pp. 15, 23; see also maj. opn., at pp. 2, 16, 41, italics added), suggesting that live animals in general (or pet rats in particular) might be products for purposes of a different type of product defect theory. The majority go so far as to posit that we need not be concerned about denying Aidan's father a design defect claim (on grounds that a pet rat is not a product) because liability for Aidan's death is better addressed as a strict liability claim for manufacturing defect or a failure to warn. (Maj. opn., at p. 26.) The necessary implication is that Aidan's pet rat is a product for purposes of defect theories other than design, but the majority offer no authority to support such an approach or mechanism for deciding when something is a product for one purpose but not another.

In my view, there is no principled basis to distinguish pet rats from millions of other items of personal property placed into the stream of commerce by retailers like Petco. They are products, subject to being deemed "defective" if the plaintiff can meet any of the accepted tests for establishing a product defect. The remaining question in this case is whether the trial court erred in precluding the jury from considering one of these recognized tests—the consumer expectations test—in deciding whether the pet rat suffered from a design defect.

11

B.      *The Applicability of the Consumer Expectations Test*

Having decided that a pet rat is not a "product," the majority opinion explains that "there is no need to consider whether the court properly instructed the jury regarding the available tests." (Maj. opn., at pp. 26–27.)  Were it to do so, however, it would agree with the trial court that the circumstances of this case did not allow the jury to consider a design defect theory based on the consumer expectation test.  (Maj. opn., at p. 27.)

Unlike the question of first impression relied on to decide this appeal, this second issue raised by the parties is one discussed in a number of California cases, including relatively recent authority from this court.  Under California law, there are two alternative tests to prove the existence of a design defect—the consumer expectations test or the risk-benefit test.  (See *Barker v. Lull Engineering Co.* (1978) 20 Cal.3d 413, 432.)  Generally speaking, "a plaintiff may proceed under either or both." (*McCabe v. American Honda Motor Co.* (2002) 100 Cal.App.4th 1111, 1126 (*McCabe*); see also *Bresnahan v. Chrysler Corp.* (1995) 32 Cal.App.4th 1559, 1569.)  As the majority opinion explains, the consumer expectations test focuses on whether the product failed to perform as safely as an ordinary consumer would expect.  (Maj. opn., at p. 27.)

In this case the plaintiff requested instructions on both tests.  Past cases have recognized, however, that the consumer expectations test is not appropriate in every case.  Rather, it applies where "the circumstances of the product's failure permit an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers." (*Soule v. General Motors* (1994) 8 Cal.4th 548, 568–569.)  Here, Petco told the trial court that no instructions on consumer

12

expectations were warranted because ordinary consumers don't understand the biology of rats as carriers of streptobacillus moniliformis.[6] Ultimately the court refused to instruct on the consumer expectations test, concluding it would be "too much" to expect that an ordinary layperson-consumer would have safety assumptions about a pet rat.

The majority assume for purposes of discussion that the biology of rats and the pathology of rat bite fever (RBF) are complex topics. I don't disagree. However, characterizing a product as "complex" is the beginning, not the end, of the analysis because the consumer expectations test can apply to complex products, depending on the circumstances of the alleged failure. (*Saller v. Crown Cork & Seal Co.*, *Inc.* (2010) 187 Cal.App.4th 1220, 1232.) This court emphasized this very point only a few years ago in *Demara v. The Raymond Corp.* (2017) 13 Cal.App.5th 545, 559 (*Demara*). The plaintiff in *Demara*, injured when his foot was crushed by a forklift, brought a strict products liability claim alleging that the forklift was defectively designed. The defendant argued that the consumer expectations test did not apply because "the ordinary consumer has no experience, and thus no expectation, as to the design and safety of the [forklift]—a complex and technical product." (*Id.* at p. 558.) We concluded otherwise, observing that "where a technically complex product performs 'so unsafely that the defect is apparent to the common reason, experience, and understanding of its ordinary consumers,' a lay jury is competent to determine whether the product's design is unsafe." (*Id.* at pp. 558–559.)

---

6       As Petco attempts to characterize it on appeal, the alleged failure of the product was "esoteric and inherently complex," and could be properly understood only with knowledge of "the biological mechanisms of pathogens, infectious diseases, and technicalities of rat breeding for commercial and laboratory purposes."

We further explained: " 'If the facts permit an inference that the product at issue is one about which consumers may form minimum safety assumptions in the context of a particular accident, then it is enough for a plaintiff, proceeding under the consumer expectation test, to show the circumstances of the accident and "the objective features of the product which are relevant to an evaluation of its safety" [citation], leaving it to the fact finder to "employ '[its] own sense of whether the product meets ordinary expectations as to its safety under the circumstances presented by the evidence.' " ' "[7] (*Id.* at p. 559; see *Jones v. John Crane*, *Inc.* (2005) 132 Cal.App.4th 990, 1003 ["[t]he fact that expert testimony [is] required to establish legal causation for plaintiffs' injuries does not mean that an ordinary user of the product would be unable to form assumptions about the safety of the products"].)

Consistent with this court's *Demara* reasoning and the evidence presented in this case, there was nothing overly complex about a pet rat or the circumstances of its alleged defect as a carrier of infectious bacteria that would preclude a jury from applying the consumer expectations test. Most people are familiar with, and have formed safety

---

[7] The majority opinion correctly recognizes that "[t]he critical question is whether the '*circumstances of the product's failure* permit an inference that the product's design performed below the legitimate, commonly accepted minimum safety assumptions of its ordinary consumers.' " (Maj. opn., at p. 29, quoting *McCabe*, *supra*, 100 Cal.App.4th at p. 1122, italics added; see *Demara*, *supra*, 13 Cal.App.5th at p. 561.) But this is not, as the majority suggest, the same thing as asking "whether the bacteria causing RBF can be designed out of rats" (maj. opn., at p. 30), a question that might be relevant, if at all, in applying the risk-benefit test. The consumer expectations test would allow the jury to find that even if it were not feasible to design a bacteria-free rat, selling pet rats that can infect and sometimes kill pet owners and their family members is inconsistent with consumers' reasonable safety expectations.

14

expectations about, pet animals sold for consumer use by a pet retailer. The jury could reasonably find that Petco itself shaped expectations about the health and safety of its pets—including the 400,000 pet rats it sells annually—in its corporate slogan, which reads, "Petco. Healthier Pets. Happier People. Better World." Indeed, Aidan's grandmother and others testified that, based on Petco's slogan and other factors, they expected Petco would sell "healthy" and "disease free" pet rats. This evidence does not, as Petco claims, merely reflect the general truism that consumers expect their products to be safe. Instead, it supports a finding that the specific product characteristic challenged here—the presence of hazardous and potentially deadly bacteria that can be transmitted to pet owners and their families—was something that ordinary consumers considered and formed expectations about.[8]

To be sure, the record includes other evidence that might tend to show the pet rat in this case did not fall below ordinary consumer expectations because Petco informs customers of bacterial transmission and RBF in several ways. And this evidence could ultimately be helpful to Petco in trying to convince the jury that the pet rat it sold to Aidan's grandmother satisfied the minimum safety expectations of ordinary consumers

_____

[8]     Additionally, the circumstances of the product's alleged failure were not esoteric. While transmission of streptobacillus moniliformis to humans may be rare, and a fatal outcome even rarer, nothing in the record indicates Aidan's response to the bacterial infection was idiosyncratic. On the contrary, it appears that many individuals with RBF suffer the same symptoms that Aidan experienced. (*Morton v. Owens-Corning Fiberglas Corp.* (1995) 33 Cal.App.4th 1529, 1535 [consumer expectations test applicable where "[t]he injury [plaintiff] incurred was not the result of esoteric circumstances"]; cf. *Trejo v. Johnson & Johnson* (2017) 13 CalApp.5th 110, 160 [consumer expectations test inapplicable where plaintiff experienced "idiosyncratic reaction[]" to drug].)

15

because such consumers understand the bacterial transmission risks associated with pet rats. But for purposes of this issue of instructional error—where the standard of review requires us to consider the evidence in the light most favorable to the party requesting the jury instruction—the fact that Petco provided information to customers about bacteria and RBF actually *supports* plaintiff's position that an ordinary consumer can and does form expectations about this kind of alleged defect.

Finally, the majority opinion suggests that even if the trial court should have instructed the jury on the consumer expectations test, the failure to do so was harmless error. (Maj. opn., at pp. 32, 34.) This conclusion is based primarily on answers the jury provided to special verdict questions on *other* causes of action—specifically negligence and strict liability failure-to-warn theories. (Maj. opn., at pp. 33, 35–36.) According to the majority, these answers make it "less than reasonably probable the outcome here would be different taking into consideration the existence and adequacy of the warning that contributes to a consumer's expectations." (Maj. opn., at pp. 37–38.)

The majority opinion recognizes at several points that a cause of action for design defect based on a failure to meet consumer expectations is independent of and analytically distinct from a failure-to-warn claim. (Maj. opn., at pp. 35, 37–38.) It likewise appears to acknowledge that a defense verdict on one claim does not preclude a plaintiff's verdict on another theory. (Maj. opn., at p. 38, fn. 17.) But California law makes clear that a "consumer's reasonable expectations are not confined to those arising from information disseminated by the manufacturer or distributor of the product." (*Hufft v. Horowitz* (1992) 4 Cal.App.4th 8, 18, fn. 8.) Rather, they are informed by a host

16

of other factors that include custom and social practice. This is particularly true with regard to a topic as universal as human interaction with pets. (See generally Bradshaw, The Animals Among Us: How Pets Make Us Human (2017).)

So for purposes of an alleged design defect, the question is not whether "warning information helps form the basis of the ordinary consumer's expectations." (Maj. opn., at p. 38, fn. 17.) It certainly can. The real question is whether, considering *all* the factors that inform the expectations of ordinary consumers, the product performed as safely as consumers would expect. Here we know the jury found that Petco was not liable in negligence or strict liability for failure to warn. But this does not mean that the risk of serious injury or death from a pet rat was consistent with the expectations of ordinary consumers. The jury's special verdict answers make it quite clear the jury believed otherwise, because it specifically found that Petco sold a dangerous pet rat and knew or should have known that ordinary consumers would not realize the danger.

The reason the jury ultimately determined that Petco was not liable on either a negligence or strict liability failure-to-warn theory had nothing to do with consumer expectations being met. Indeed, Petco's counsel told the jury that the reason it should return a defense verdict on the failure-to-warn claims was because the likelihood of contracting RBF was infinitesimal. And it appears the jury followed this advice, finding that although the rat was dangerous, the risk of death or serious injury was insufficiently "substantial."

Given the dangers associated with overwarning (see generally, e.g., *Dowhal v. SmithKline Beecham Consumer Healthcare* (2004) 32 Cal.4th 910, 932), the

17

substantiality of a risk is certainly a relevant consideration for a jury to take into account in deciding whether a product seller should have included a different or additional warning. But even a very small likelihood of a very bad result may be inconsistent with the expectations of ordinary consumers and therefore unacceptable. Here, Petco provided general warnings about the existence of RBF and the fact that small animals like rats can carry bacteria or other germs which may cause flu-like symptoms. But it never advised purchasers there was any risk of death or serious injury. That it chose not to do so is hardly surprising—the thought of bacteria-laden rodents transmitting a deadly illness conjures medieval images that could hardly have been good for pet rat sales. And perhaps a jury could rationally conclude that the incidence of serious consequences from RBF is sufficiently rare that no more specific warning was required. But it does not mean that ordinary consumers would expect to die—or, worse yet, watch their child or grandchild die—after playing with a furry little creature purchased for benefits of companionship. In those instances, liability based on the product's *design* could be properly imposed on the product seller so that cost of a rare and unexpected—but nonetheless devastating—injury can be internalized in the price of the product and spread among all users. In that way, the price of the product could reflect its true cost. Consistent with the well-established consumer expectations test, the jury here should have made that call.

I would reverse and remand for a new trial at which the court would instruct the jury that it may return a plaintiff's verdict if it finds, along with other elements in CACI

No. 1203, that the pet rat which caused Aidan Pankey's death was not as safe as the ordinary consumer would have expected.

DATO, J.